### No. 22,135.

JOHANNA NASH, *Appellee,* v. AGNES HARRINGTON, *Appellant,* et al.

SYLLABUS BY THE COURT.

1. ORAL CONTRACT—*Agreement to Devise or Convey Land.* The record examined, and *held* that the evidence is insufficient to supply the requisite and essential elements of a parol contract between a father and daughter for the devise or conveyance of 80 acres of land.

2. SAME—*Oral Agreement to Devise Land Must Be Established by Competent and Sufficient Evidence.* A provision in a will devising land pursuant to a prior parol agreement is a confirmation of such agreement, and it cannot be defeated by a subsequent revocation of the devise; but before this rule of law can be applied, it is essential that the existence of the prior parol agreement be established, by competent and sufficient evidence.

Appeal from Russell district court; JACOB C. RUPPENTHAL, judge. Opinion filed March 11, 1922. Reversed.

*George W. Holland, M. J. Gernon,* both of Russell, and *W. A. S. Bird,* of Topeka, for the appellant.

*J. E. Driscoll, Oscar Ostrum,* both of Russell, and *J. E. Addington,* of Topeka, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This lawsuit between two sisters was for the recovery of eighty acres of land conveyed by their father to the defendant, Agnes Harrington, but which was claimed by the plaintiff Johanna Nash, under an alleged oral contract with her father and confirmed by his will.

These litigants are the daughters of the late Timothy F. Harrington, a Russell county pioneer, who died in 1915. The family story is the not unusual one of long years of hardship and poverty followed by material prosperity. Timothy Harrington settled in Russell county in 1877. He had left his family in Michigan while he founded a new home in Kansas. Johanna, his eldest daughter, then a girl of fourteen years, came to reside with and assist him. The mother and the younger children, including Agnes, did not follow until 1883. Johanna remained at home until about 1887, when, at the age of twenty-four, she took up domestic service, and for the next twenty years she sent home part of her earnings to help support the family, and to help her father in his financial troubles, and, indeed, to help him pay for the particular eighty acres (state school land) involved in this controversy. At various times over a long period of years the father had expressed appreciation of Johanna's helpfulness, saying that but for her assistance he could not have won

Nash v. Harrington.

out in life's battle, could not have stayed in Kansas, could not have saved this eighty acres, and that he intended to divide his property between Johanna and Agnes, except that Johanna should have the eighty acres, and that it was hers already. The mother died in 1900. In 1903 the father made a will, which in part provided:

"5. I give and bequeath to my beloved daughter Johanna Harrington the east half of the northeast quarter of section (36) thirty-six in township fifteen south, range 12 west, Russell County, Kansas, the same being known as the school land.

"6. I give and bequeath the balance and residue of all my property, both personal and real, to my beloved daughters, Agnes Harrington and Johanna Harrington, share and share alike, to be their absolute property forever."

Johanna married in 1910. The other children, except a daughter who had died, were grown and scattered, and Agnes remained with her father and cared for him, and did much of the rough hard work· on the farm. As early as 1894, perhaps on account of financial troubles, the father conveyed the home quarter section to Agnes, accepting from her in return a life lease of it, and a lease of a tract of land belonging to Agnes, and also a lease of this eighty acres of school land. At that time and for many years afterwards (until paid for and patented), the title to this school land remained in the state of Kansas. In June, 1912, Harrington made a codicil to his will which, if legally sufficient, revoked the bequest of the eighty acres to Johanna in the will of 1903. The codicil reads:

"I do give and bequeath unto my daughter, Agnes Harrington, all of my property, both personal and real."

At the same time, June 18, 1912, Harrington made and delivered a deed to ·Agnes conveying to her the eighty acres of school land.

Harrington died in 1915, and this lawsuit to set aside the will and to enforce the father's alleged oral contract with Johanna was begun. All matters involved in the lawsuit other than the conflicting claims of the two sisters to this eighty acres were determined by the trial court and need no attention here.

An advisory jury made answers to sixty-seven special questions, and the trial court made elaborate findings of its own covering twelve pages of the abstract. It seems necessary to give space to a considerable number of these:

JURY'S FINDINGS.

"1. Did the plaintiff, Johanna Nash, and her father, T. F. Harrington, ever make an oral agreement or have a verbal understanding that related to services by her for him or compensation to her by him? Ans. Yes.

"2. If you answer question No. 1 'yes' state when and where, such agreement and understanding were made and had, and what each was to do and give, and what each was to get and receive, and when. Ans. About 1887 to 1900 home place S. 25-15-12. She was to furnish what money and work she could, to receive the 80 acres of school land and half of other property at his death.

"3. If you answer No. 1 'yes,' did plaintiff Johanna Nash thereby agree to do anything in the future? Ans. Yes.

"4. If you answer No. 3 'yes,' did Johanna Nash thereafter do and perform all she agreed to do as set out in your answer to No. 2? Ans. Yes. . . .

"11. Did Timothy F. Harrington, for what his daughter, Johanna, had done, and was doing for him, promise and agree to give her the school land at his death? Ans. Yes.

"12. Was the will of Timothy F. Harrington, executed December 11, 1903, made by him in pursuance of a promise on his part to give his daughter, Johanna, the school land and a part of his other property, in return for what she had done, and was then doing for him? Ans. Yes. . . .

"25. Does the evidence show that the codicil was made free from undue influence by Agnes upon her father? Ans. Yes . . .

"40. If the father made promises to give of his property to his daughter Johanna for some services to be performed by her, did he at the same time make similar promises to his daughter Agnes? A. Yes. . . .

"52. Did Timothy F. Harrington make and execute the codicil to the will about June 1912, under constraint of anyone? . . . Ans. No.

"53. Did anyone on the day of the execution of the codicil in June, 1912, and making of the same in any way at the time of signing same or while same was being prepared attempt in any way to influence Timothy F. Harrington into making of the same? . . . Ans. No.

"54. Did anyone at any other time attempt such influence? . . . Ans. No.

"56. How old is Agnes Harrington at this time? Ans. 49 years.

"57. How many years did Agnes Harrington remain at work at the home of her father after coming to Kansas? Ans. About 32 years. . . .

"59. State the kind of services rendered by Agnes Harrington on the land in controversy; also what household duties done, and whether she gave any care to her parents, and if so, state the kind, and for what period of time? Ans. General farm work, general house work and all care necessary covering a period of 32 years. . . .

"61. Did Johanna Nash expect that the money sent to her parents by her should be repaid to her? In money or otherwise? Ans. Yes."

TRIAL COURT'S FINDINGS:

"7. At some time, or times, between 1887 and 1900, on the home place in section twenty-five, Timothy F. Harrington, stated to his daughter, Johanna, that he would give her the east half of the north-east quarter of section thirty-six, fifteen, twelve, being the 'school land,' and one-half of all other property owned by him at the time of his death, in consideration of the faithful service she had done for him theretofore, and for services, labor, and assistance she might give him thereafter, without any very clear definition of the exact kind

or quality or character of such labor or assistance, or how long it should last, or when it should cease. This offer so made by her father was accepted, and acted upon by the plaintiff to the extent of thereafter contributing her services and labor about the household and farm as long as she remained at home, and thereafter, from time to time when at home on a visit, and also to the extent of contributing more or less of her earnings for a number of years to perhaps as late as 1908.

"8. That Timothy F. Harrington, during the time Johanna was at home, or assisting him from her earnings, expressed himself at times to friends and neighbors that his daughters, Johanna and Agnes, were both good to him, and that the aid he received from Johanna helped him to hold and save his property, and perhaps to remain in Kansas; and that for what she had done, and had promised to do for him, he would give her the school land and one-half of all other property owned by him at the time of his death. . . .

"10. After the offer of the 'school land' by her father on condition of her service and help, Johanna for many years contributed, while a strong mature woman, to her father's welfare by her labor and by some money contributions. She complied as fully, perhaps, as the vague terms of the offer and acceptance required, and no question was raised by her father or anyone else of non-compliance. . . .

"14. On December 11, 1903, Timothy F. Harrington made a will by the terms of which he gave and devised to his daughter, Johanna, the tract of land known as the school land and divided the rest of his property equally between his daughters, Johanna and Agnes, except for a few minor bequests. This testamentary disposition was substantially along the lines of the earlier offer at some time or times between 1887 and 1900 on part of Timothy F. Harrington to give the school land to Johanna, and half of his other property at his death, and which offer was accepted by her by her acts and deeds, if not in words; that at the time of making said will the testator was in sound mind and in good health, mentally and physically, and under no constraint; that at the time of making said will Johanna had complied, so far as she could up to that time, with the provisions of the offer theretofore made by her father relative to the 'school land' and his other property. . . .

"17. . . . It does not appear that Timothy F. Harrington was under any promise to Agnes, or other legal obligation, to convey said land to her, but she had cared for and assisted him almost, or quite, unaided since the death of her mother in 1900, and sustained him under the increasing burden of years with no one about their home except father and daughter, and perhaps a part of the time an orphan or more. After the making of the codicil, during the three remaining years of the life of her father, and during his decline to his death, when nearly eighty-five years old, she continued to care for him, to administer to his wants, and provide such comfort as she in her way, perhaps rude and uncouth, was able to give. For from five to ten or more of the last years of the father's life, practically none of his children, except Agnes, gave him help, aid, comfort or assistance in any way whatever. All of them except Agnes were in Oklahoma, and came up but rarely and for very brief visits then. Agnes cared for her father until his last breath. . . .

"18. Agnes Harrington learned of the making of her father's will of December 11, 1903, soon thereafter, and of the provisions made therein for both herself and her sister, Johanna. At the time she knew in a general way of her father's earlier purpose to give Johanna the 'school land' for what she had done, and would thereafter do, but she did not know exactly the terms of the understanding between her father and her sister, Johanna. . . .

"21. It is largely through the help of his two daughters Johanna and Agnes, that Timothy F. Harrington was able to accumulate and hold the property which he described in his will of December 11, 1903. It is impossible to say from the evidence what the share of each daughter was in the accumulation and preservation of said property. Johanna helped for five years before Agnes came to Kansas, and when Agnes was too young to do much if she had been there. Both of them worked faithfully for years thereafter, Agnes always at home, and Johanna when not at home helping in a way as best she could from her meager earnings. Agnes continued with her father for years after Johanna left. Both women, in their appearance in court, showed the effect of their strenuous pioneer life, but the battle had either gone the harder with Agnes, or Johanna possessed a finer grain which did not show the same. . . .

"25. There is no direct proof that any knowledge ever came to the plaintiff of the promise of her father to give her the 'school land' on certain conditions, but such finding is reached inferentially. . . .

"27. . . . The inhibition of the law against testimony of transaction between each daughter and their father has shut out almost everything with relation to the dealings between Agnes and her father, either in word or transaction, and also very much of the dealings between Johanna and her father, both words and acts. . . .

"28. The nature, temperament, and characteristics of the two women in court and on the witness stand were noteworthy. Johanna was always calm, cool, collected, quiet, modest, self-possessed, and with the demeanor of urbanity which bespeaks association with other people. Agnes was restless, sometimes seemingly shrewdly cunning, sometimes seemingly dull and uncomprehending. She showed the peculiarities of one in much solitude and alone, far removed from daily association with human society. When the case was first called for trial, to be set down for a day certain, Agnes would not appear in court, and upon the statement of her counsel of their perplexity the court required Agnes to be brought in from her farm about twenty-five miles from the county seat. She then appeared in court and talked so incoherently, hysterically, and irrationally that the court, upon showing made, ventured to direct by order of court the attorneys who had theretofore acted for her to continue to act, notwithstanding her refusal to have anything further to do with them, and her ramblings about some mysterious attorneys that were to be sent here from the east by some Orphan's Home. During the trial to the jury, however, she permitted her attorneys to handle this case, and displayed no incoherence or hysteria."

"CONCLUSIONS OF LAW. (mixed with findings.) . . .

"2. Plaintiff could be compensated in money for all she did and gave in pursuance of her agreement with her father. . . .

Nash v. Harrington.

"8. The will of Timothy F. Harrington of December 11, 1903, was good in law, and carried out and expressed as to the school land, the terms of the earlier agreement between him and his daughter Johanna.   .   .   .

"15. The deed of June 18, 1912, by Timothy F. Harrington to his daughter Agnes, conveying to her the title to the school land, was made in consideration of natural love and affection, and apparently for her care of him and services to him, but not for any money or other property transferred by Agnes to her father. This deed was therefore a voluntary conveyance. Agnes knew to some extent, at the time of her taking the title, that her father had in some way promised the school land to her sister, Johanna. Such deed was at the time of its execution and delivery ineffectual and void as against the rights of Johanna already acquired in such school land.   .   .   .

"20. The oral contract between Timothy F. Harrington and his daughter, Johanna, was removed from the operation of the statute of frauds by its confirmation in written memorandum by the will of December 11, 1903, and was also removed by full performance on part of Johanna."

The trial court gave judgment in favor of the plaintiff, Johanna Nash, awarded the land to her, and the rents thereof, $300, which had accrued since her father's death.

The defendant, Agnes Harrington, appeals, setting up various errors, the most serious of which is that there was no evidence to support the finding of an oral contract between Johanna and her father upon which the judgment is founded.

If there ever. was a contract between Johanna and her father that she should receive this eighty acres in consideration of her contributions in money and her helpfulness in other respects, the · evidence is ample to prove that she fully performed her side of the bargain. And it has been frequently decided that an oral promise to convey or devise land under such circumstances will be judicially enforced.

It has often been held, also, that a provision in a will to effectuate the oral promise of the grantor is irrevocable by a subsequent codicil or by other and later disposition of the property so promised.

"A will duly executed, in pursuance of an agreement based upon a valuable consideration, becomes itself, in a sense, an enforceable contract. The testator cannot, by making a later will, escape the obligation confirmed by the first one." (*Nelson v. Schoonover,* 89 Kan. 388, 392, 131 Pac. 147.)

In that case, the will confirmed a prior parol obligation. But here our difficulty is to sift from the record the elements constituting a parol obligation, to which the bequest of 1903 could attach by way of confirmation. Here the trial court rightly disregarded the positive finding of its advisory jury, and held "such finding is reached inferentially."

In *Bless v. Blizzard,* 86 Kan. 230, 120 Pac. 351, the oral contract was established:

"A definite contract to leave the land to Bless by will was clearly and certainly established within the rule stated in *Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743. Much of the evidence consisted of statements of Noel to his neighbors and friends concerning the arrangement. . . . So Noel said to Bless, 'Stay with me and care for me until I die and I'll will you my land.' " (pp. 232, 233.)

In *Anderson v. Anderson,* 75 Kan. 117, 128, 88 Pac. 743, the opinion reads:

"While but one witness testified to the contents of the correspondence which made up the contract, the fact that a contract existed, and its terms as found by the court, are supported and reinforced by the conduct of all the parties."

There were plenty of facts established by the evidence and by the findings of the court to withstand the trial court's inference that the essentials of a contract had been entered into by Johanna and her father—the father's equal or greater obligation to Agnes, his repeated acknowledgments thereof, the codicil of 1912, and the conveyance of the 80 acres to Agnes simultaneously with the codicil, the thirty-two long years of devotion by Agnes to her father's service and care, and the fact that that service had blighted her life and reduced her to the boorish creature she was. (*Baldwin v. Baldwin,* 73 Kan. 39, 84 Pac. 568.)

During the years when the father was wont to tell his acquaintances how invaluable had been Johanna's assistance to him, he made similar acknowledgments of his obligations to Agnes, yet his conveyances, bequests and gifts to Agnes were held by the court and jury to be without consideration—not that they are invalid for lack of such; but the testimony that he owed so much to Agnes and his declarations of what he intended to do for her came largely from the same witnesses as did the evidence favorable to Johanna. Indeed, that is the finding of the jury and trial court. (Jury's finding, No. 40; trial court's finding No. 8.)

This court would cheerfully affirm this judgment, for there is no doubt of Johanna's merits and deserts, but counsel for Agnes have the right to insist, before the judgment against her can stand, that the essentials of a contract between Johanna and her father be first established. This, we confess, baffles us. Counsel for the appellee seek to assist us in this perplexing dilemma. To do so, they quote from the abstract:

"Dan Casey [witness] It was about Christmas time in 1894. Mr. Harrington said he really didn't know how he would have got through the hard years if it had not been for her helping him; that he would have lost his home. And he said, I will never forget Johanna, and I have promised, and I will divide my property equally between my two girls, and Johanna will get the eighty acres of school land, which is the way he described it. Said she had sent him money; if it had not been for Johanna he would have lost his home. We got to talking about the girls, and he got to talking about his property, and he said he was going to do for the girls just what they done for him, especially Johanna. He was going to divide his property with her and Ag. And he told me that not once, but several times. She had done for him, and he would do for her, and that he would divide with these girls. She worked for him, and he would divide up for her like she done for him; and he also said she stayed with him—if it hadn't been for her he couldn't have stayed there at all. He told me that Johanna sent him money."

"Flora Kleinneger [witness]: 'one of the times when I was visiting at the home of Timothy F. Harrington, he told me the two girls should share equally in the will with the exception of Johanna Nash. She should have the school land, as that was already hers. . . . · He further stated to me at that time had it not been for Johanna Nash he would have lost all of his property, for she was the one that went out and tided him over the poor seasons. . . . He spoke about the school land and he stated to me that the two girls, meaning Johanna Nash and Agnes Harrington, to share equally under his will with the exception that the school land should all be Johanna's, that was already hers.' "

There was much of this sort of testimony, but does that prove an agreement between two parties which may be enforced in equity? We think not. It merely shows how greatly Harrington appreciated his daughters, and what, at those particular times, were his intentions towards them. In *Pantel v. Bower*, 104 Kan. 18, 178 Pac. 241, such evidence was considered:

"Several neighbors of the defendant gave testimony, the substance of which is fairly illustrated by that of Mr. Carmean, whose testimony as to conversations with Mr. Bower was, 'He said they had taken the little girl when she was but two years old and . . . raised her as their own, and that when he was gone she should have his share of the property.' . . . The testimony of the neighbors concerning statements made by Mr. Bower in casual conversations with them, show mere statements of his intention that when he was gone Stella should have his share of the property. They did not show the existence of the contract relied upon by the plaintiff, and are not of themselves sufficient to raise an implication that any contract of that character existed." (pp. 20, 21.)

In the cases where oral contracts for the conveyance of land have been upheld by this court, it will be found that there was evidence tending to prove the primary facts constituting the contract. Once

some such evidence was forthcoming, then such testimony as that of the witnesses Casey and Kleinneger, quoted above, would perform the valuable function of reinforcement or corroboration, by showing that the evidence to support the main proposition was true. But the testimony of Casey and Kleinneger (and the other testimony to the same effect) is corroborative of what? Nothing, because of an utter want of the matter of prime importance—some evidence that Johanna and her father made the contract relied on. The evidence to prove the contract need not be direct, but it must, in sum, be established by clear and satisfactory proof. (*Anderson v. Anderson,* 75 Kan. 117, 88 Pac. 743; *Wooddell v. Allbrecht,* 80 Kan. 736, 104 Pac. 559.) In *Long v. Duncan,* 10 Kan. 294, it was held:

"To take a case of parol contract for the purchase of land out of the operation of the statute of frauds under a claim of part performance, the alleged contract should be first shown to be definite and unequivocal in its terms, and should be made out by clear and satisfactory proof." (Syl. ¶ 1.)

Sometimes the inhibition of the statute (Civ. Code, § 320) which disqualifies a litigant to testify in her own behalf touching her alleged oral contract with a deceased person for an interest in land is circumvented by testimony such as this: "I, the plaintiff, heard my father say to neighbor Jones that he, my father, had made an agreement with me that if I would stay at home with him, etc., that I should have the farm." This sort of evidence is competent and to the point, although, of course, it is greatly in need of supporting evidence, of additional facts, circumstances and inferences consistent therewith, before a court would be justified in finding that such a contract was made. Yet such testimony as that given in the supposed case narrates the main, controlling and ultimate fact which must somehow be established in the course of the trial. Inferences alone will not supply the want of real evidence on the main fact in issue—certainly not where the standard of proof is so high as it has to be before the case of a parole contract for the conveyance of land can be relieved from the operation of the statute of frauds.

This court has no disposition to be captious about the vagueness of the time fixed by the trial court and jury when the alleged contract was made, if we could but discern some real evidence that it had been made at all. But we search the record in vain for evidence of any contract, any meeting of minds, any offer of the

Nash v. Harrington.

father for Johanna's acceptance, regardless of the uncertainty of the time of its alleged making. Note the trial court's finding No. 7. "At some time, or times, between 1887 and 1900," Harrington stated to his daughter, Johanna, that he would give her the "eighty acres," etc., "in consideration," etc. There is no evidence of any such statement made by Harrington to Johanna. Again, in the trial court's finding No. 10, it is said: "After·the offer of the 'school land' by her father," etc. There is no proof, no evidence, of any such offer.

No decision will be found in our own reports, and we may be permitted to doubt that many such are recorded elsewhere, where an alleged parol contract concerning an interest in realty has been relieved from the disability of the statute of frauds under such a lack of evidence on the controlling fact in issue as that disclosed by this record. (*Alexa v. Alexa*, 108 Kan. 38, 193 Pac. 1083.)

In *Pantel v. Bower*, 104 Kan. 18, 22, 178 Pac. 241, it was said:

"The rule adhered to in cases of this general character is, that there must be facts and circumstances sufficient to raise a convincing implication that the contract was made, and to satisfy the court of its terms; and there must be no inequity in its enforcement. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743; *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396; *James v. Lane*, supra. Until plaintiff was more than fourteen years of age, she believed that the defendant and Mr. Bower were her natural parents. It cannot be said she failed to show equitable considerations in her favor. She was given less than four years of schooling; when she should have been in school she was plowing corn, and from that time until she was past twenty years of age she performed the labor of a hired man in the fields. Her years of faithful service and arduous labor doubtless assisted largely in the accumulation of the property possessed by the defendant; but under the authorities cited there must be more than mere equitable considerations shown."

In *Baldwin v. Baldwin*, 73 Kan. 39, 46, 84 Pac. 568, it was said:

"It is also held that before specific performance of a parol agreement to convey lands will be enforced the facts relied upon must be established by clear and satisfactory proof."

The trial court made a finding that plaintiff could be compensated in money for all she did in pursuance of her alleged agreement with her father. (Conclusion No. 2.) In such case, the rule has been laid down by this court, in *Englebrecht v. Herrington*, 103 Kan. 21, 172 Pac. 715, where a finding was that the plaintiff could be compensated in money for his services. The court said:

"The general rule is that every parol contract concerning lands is within the statute of frauds and perjuries and unenforceable except where the per-

formance cannot be compensated in damages. . . . If the value of the plaintiff's services may be determined and compensation made in money the case is not taken out of the statute . . . This finding, which met the approval of the court, . . . makes it clear that the verbal contract is within the statute, and unenforceable." (p. 24.)

But aside from this last point, this court is constrained to hold that the findings of the jury and the trial court are not sustained by the evidence, and the judgment based thereon must be set aside.

Reversed and remanded with instructions to enter judgment for defendant.