788

No. 35,850

In the Matter of the Estate of Minnie G. Henry, Deceased. (J. B. HENRY, *Appellee*, v. SARAH SCURRY, RUTH K. CHAMBERS, as Administratrix of the Estate of Minnie G. Henry, Deceased, et al., *Appellants*.)

(137 P. 2d 222)

Opinion filed May 8, 1943.

A. M. Cowan, of Wichita, argued the cause, and E. J. Taggart, of Wellington, C. A. McCorkle, W. A. Kahrs, Robert H. Nelson and Henry L. Butler, all of Wichita, were on the briefs for the appellants.

George Siefkin, of Wichita, argued the cause, and H. W. Goodwin and W. H. Schwinn, both of Wellington, were on the briefs for the appellee.

The opinion of the court was delivered by

DAWSON, C. J.: This is an appeal from a judgment of the district court decreeing specific performance of an alleged oral contract to devise 240 acres of Sumner county land. The promisors were the late J. S. Henry and Minnie G. Henry, his wife, of Boonville, Mo. J. B. Henry, of Mayfield, Kan., nephew of J. S. Henry, was the promisee.

J. S. Henry and Minnie G. Henry each owned an undivided one-half interest in 480 acres of land in Sumner county.

J. S. Henry died testate in Missouri in February, 1939, after devising all his property to his wife, Minnie G. Henry. She died intestate in Missouri in June, 1941. One Ruth K. Chambers, of Boonville, Mo., was appointed administratrix of Mrs. Henry's estate, and Floyd N. Anderson was appointed ancillary administrator by the probate court of Sumner county.

After certain abortive proceedings had been commenced by parties interested in the Sumner county property, J. B. Henry filed a petition in the probate court of Sumner county laying claim to three 80-acre tracts of the land. He alleged that Minnie G. Henry had acquired title to the land in 1898 and that in 1919 she conveyed an undivided one-half interest in it to her husband; that prior to 1907 claimant's father had rendered to Minnie G. Henry and J. S. Henry the usual services performed by a real-estate agent—leasing the land, collecting the rent, selling the crops, paying the taxes, and keeping up the improvements; and that beginning in 1908 this claimant rendered the same kind of services down to 1932.

Claimant alleged that during that long interval Mr. and Mrs. Henry frequently told him that they appreciated his services and that they would, "at some future time, make definite arrangements with him to see that he was well paid for his efforts and labor in their behalf."

Claimant alleged that at harvest time in 1932, Mr. and Mrs. Henry came from Missouri to Sumner county and he took them to their property, and that they there expressed their appreciation of his services and said—

". . . that it was time that some definite arrangement be made for paying him for such services. They further stated to this petitioner that they were without children themselves, that they had no close relatives and that it was becoming increasingly difficult for them to come out to Sumner county, Kansas, each year to see the petitioner about the management and care of the real estate. They further stated to the petitioner that they desired the petitioner, in the future, to take full charge and control of the said real estate and further requested that instead of having them come to Sumner county, Kansas, to make settlement, that he come to Boonville, Mo., to make settlement each year. . . . that they desired to have for themselves, and the survivor of them, all of the income and profit from the real estate so long as either of them might live; but that if the petitioner would continue to render services to them in the future as he had in the past, that they would so prepare their wills that upon the death of the survivor of them, he, the said J. B. Henry, would receive as payment for services rendered in the past and to be rendered in the future and would become the owner of, by bequest and devise, the following described real property in Sumner county, Kansas, to wit: The west half of the northeast quarter and the northwest quarter of section 10, township 31 south, range 4 west."

Claimant alleged that in response to these statements of Mr. and Mrs. Henry he stated to them—

"That the said real estate would constitute ample payment for the services which he had rendered in the past and for the services which he might render in the future; and he further stated to the said Minnie G. Henry and J. S. Henry that he would render the said services to them and to the survivor of them without regard to how long they or either of them might live, and take said land as payment."

Claimant alleged that relying upon the agreement so made he thereafter leased the property, collected the rents, attended to harvesting the crops, took care of the necessary repairs of fences and improvements, advised Mr. and Mrs. Henry relative to the sale of the crops, took care of the insurance on the property, collected the proceeds of the sale of crops, and faithfully accounted to them for all the farm income until the death of J. S. Henry and thereafter

until the death of Mrs. Henry—and that he had thereby fully performed his part of the alleged oral agreement of 1932.

Claimant also alleged that from 1908 until the death of Mrs. Henry in 1941 he had received no payment for his services, and that it never was contemplated by him or by Mr. and Mrs. Henry that he should receive any other payment than the promised share of the Sumner county land "which was to be willed to him upon the death of the survivor of them."

Claimant's petition further alleged the failure of J. S. Henry and Minnie G. Henry to carry out their agreement with him, and that he was entitled to specific performance of the alleged oral contract of 1932, and that—

"In the event that the court should find that it was intended that J. B. Henry should be compensated in money, . . . then your petitioner alleges that the services rendered by him under and by virtue of the oral contract alleged herein, were of the value of $12,000."

Certain heirs of Mrs. Minnie G. Henry, including Ruth K. Chambers, administratrix of her estate, filed answers denying generally and specifically the material matters tendered in issue in claimant's petition, and pleaded at length some matters which may require no attention, and alleged that if claimant rendered any such services as he alleged, he had an adequate remedy at law and could be compensated therefor in money and was therefore not entitled to specific performance.

These answering defendants further pleaded that the alleged promise and contract was within the statute of frauds and void, and—

"That the greater portion of said alleged services, if rendered, are barred by the statute of limitations, the same having accrued and been rendered, if at all, more than three years prior to the commencement of this action; that the services claimed to have been rendered were rendered for J. S. Henry, and any claim against J. S. Henry is barred by the statute of limitations, having accrued more than three years prior to the commencement of this action and for the further reason that said claim was not presented within two years and fifty days after the death of J. S. Henry."

The ancillary administrator also filed an answer, pleading want of knowledge of the matters alleged in claimant's petition and demanding strict proof thereof, and—

"Your administrator, as a further defense to the said petition, pleads that the same is barred by the applicable statute of limitations and by the statute of frauds . . ."

The claim was heard in the probate court on evidence adduced by the claimant and by the heirs of Minnie G. Henry and by her administrator. The probate court allowed the claim in the sum of $2,955.87.

All parties appealed to the district court where, after some preliminary motions were disposed of, the cause was tried *de novo* without a jury.

Plaintiff produced a witness, one Gene Stitt, whose father was the tenant on the Henry land for a number of years, and who himself had lived for a time on the Henry land and had farmed part of it. Stitt testified to conversations he had with J. S. and Minnie G. Henry in which they expressed their esteem for the claimant, saying he was an honest man and that they could depend on him to look after their affairs. This witness recalled hearing them say that claimant would be paid for his services; that in 1932 witness heard a conversation between J. S. Henry and wife and the plaintiff which occurred at the Henry land and in which J. S. Henry asked plaintiff which part of the land he liked best, that plaintiff said he liked the three south eighties, and that J. S. Henry said that those three eighties would be his (plaintiff's); that Mrs. Henry took part in the conversation and agreed with Mr. Henry. She said, "Burnham (plaintiff) seemed like their own child, they had no children of their own, and he took the place of their own child so far as their interest was concerned." About paying him, "she said that would be fair enough [and] Burnham said that was agreeable with him." Stitt further testified, "After that time, there was no particular change in the management of the real property. Burnham looked after it up until her death." The cross-examination of this witness developed some inaccuracies in his direct testimony and some limitations as to the extent of his information touching plaintiff's services for Mr. and Mrs. Henry and tended to show that he was not aware that during the years when his father was a tenant on the farm, his father and J. S. Henry had extensive partnership dealings in carloads of cattle which were fed on the crops of the Henry farm. He testified, "I had forgotten about the partnership cattle."

Another witness, Kaiser, farmed part of the Henry land for 15 or 16 years. He testified that during that entire interval the plaintiff acted as local representative for J. S. Henry and wife, and that he had heard Mr. Henry say that Burnham would look after their interest; that sometimes Mr. and Mrs. Henry would come out to

Sumner county without seeing the witness, and "in such years, my only contact would be through Burnham Henry." However, on cross-examination, he admitted that he corresponded directly with Mr. and Mrs. Henry in regard to the condition of the crops, and identified some letters he had written to them.

Another witness, Mercer, testified that he farmed some of the Henry land in 1924 and 1925, and in 1925 he had a conversation with J. S. Henry in which the latter said that plaintiff would be paid for his services; that plaintiff's father had arranged with J. S. Henry for the witness to rent part of the Henry land; but this witness had never talked to Burnham (plaintiff) about renting it.

Plaintiff's wife testified that she first met J. S. Henry and wife in 1915, got acquainted with them in 1916 when she married plaintiff, and in 1917 she heard them talking about the services Burnham was rendering them:

"The said they wouldn't know how to get along without Burnham; he was like their own boy; he had rendered a good deal of service to them and they hoped they could repay him. . . .

"Q. Who said those things? A. They both did. . . ."

Touching the alleged contract of 1932, the court itself made inquiry of this witness:

"[By the Court]: Can you state what Uncle Sam [J. S. Henry] said on the place in Creek township when Gene Stitt and his father and you and Aunt Minnie and Uncle Sam were there? Can you state what Uncle Sam said about J. B. Henry's services? A. Yes, he said that Burnham had rendered him a lot of services and he felt he would like to repay him for his services, and after they both passed away that Burnham could have the three eighties across the road from the house in repayment for his work and kindness to them.

"Court: What did Aunt Minnie say? A. She said the same things.

"[Counsel for defendants]: We object to that,—

"A. She was there and she said that was all right with her if it was all right with Burnham, and Burnham said he would look after both of them and when they were gone he did think the three eighties was all right for his pay."

Claimant himself testified over objection touching his services in behalf of Mr. and Mrs. Henry; that he started doing so in 1908, since which time nobody looked after the land but himself and that he did so until the death of Mrs. Henry in 1941; that he saw that the land was plowed properly, planted to crops at the proper time, and taken care of at the proper time; that he saw about storing the wheat, oats and other grain, and that the alfalfa was cut and taken care of, and saw to the selling of it and other feed, looked after

the fences and buildings, that his father and Mr. Henry had a partnership in the raising of hogs for eight or ten years, and in the cattle business for three or four years, and that he (the witness) looked after the cattle; that he lived about twenty miles from the Henry land and made from a dozen to twenty trips to that land each year, and that the money value of his services was $300 a year since 1908. Claimant also testified that while in Boonville, Mo., in the fall of 1939 or 1940, he heard a conversation between Mrs. Henry, and the claimant's wife:

"Q. The court says you may tell what your Aunt Minnie said and what your wife said at the second conversation.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"A. They were talking and my wife asked if she was sure she had a will and she said 'yes' and that we didn't need to worry, when she was gone I would get what she promised and my wife told her that she talked to Ruth [Ruth K. Chambers] and Ruth was positive she didn't have a will, and she (claimant's wife) wanted to be sure and she (Mrs. Henry) said we didn't need to worry, she had things fixed so we would get what she promised me, and later she (Mrs. Henry) said to get Ruth and go to the lawyer's and have him come down and they would fix it for certain and there would be no trouble."

On cross-examination, claimant testified that he borrowed $500 from J. S. Henry in 1929, but repaid it by check in about a year but did not know where the check was; that he could not tell how many acres of the Henry land were in wheat in any year nor how many bushels it made; that he kept no records except annual records which he gave to J. S. Henry:

"Q. You give him the whole account? A. I didn't for the wheat, he sold his wheat himself. I kept account of what I took in.

". . . I don't know of any settlement between C. A. Stitt and J. S. Henry, or Minnie Henry, prior to the one signed on July 17, 1939. They might have had a settlement in 1925, but I don't know anything about it. That was their private business.

"Q. Did you know anything about a settlement in 1929 between C. A. Stitt and J. S. Henry? A. That was their private business.

"Q. You don't know anything about it? A. No, that was their private business.

"Defendant's exhibit 12, a note signed by C. A. Stitt for $510, dated July 9, 1929, was shown to the witness.

"I don't know anything about that.

"Q. Did you know of any transaction between C. A. Stitt and J. S. Henry other than the farm, relative to the farm livestock or hogs? A. I know they had transactions when they handled hogs.

"Q. That related to the farm, didn't it? A. Yes, sir.

"Q. Do you know anything about Mr. J. S. Henry furnishing Gene Stitt with seed oats for two years and Stitt not paying for it. A. Gene paid for those later.

"Q. When? A. My uncle told me he paid for them.

"Q. When did your uncle tell you he had paid for them? A. I couldn't tell you exactly.

"Q. Did you handle the transaction? A. No, sir."

Recalled as a witness, claimant's wife testified that on Sunday, May 4, 1941, she and her husband were in Boonville and went to Ruth Chambers' house. On Monday morning she and her husband called on Mrs. Minnie Henry and she, the witness, had a conversation with her. Mrs. Henry said she had a will and that everything was fixed, "not only for Burnham, but lots of other people."

The witness further testified:

"After she got it in her head there wasn't any will, she said she would have her lawyer come. I don't know how she got it into her head. She didn't tell me to get a lawyer or my husband. She stuck to it that she had a will until after Ruth said she didn't. That was after Ruth came to the house. I don't believe I told Aunt Minnie that. It worried me considerably. I don't believe Aunt Minnie ever admitted to me the she didn't have a will. After we talked to Ruth Chambers, my husband, Ruth and I went down to see Mr. Martin (attorney). I don't know whether we asked him to go out to Aunt Minnie's house, but he got out there. I wasn't present when Mr. Martin talked to Mrs. Henry. The doctor thought it best not to do. After Mr. Martin came out, he said she didn't want to make a will."

Elsewhere this witness testified:

"I had a conversation with Ruth and she said there wasn't a will, and that worried me, and I thought I had better have another conversation with Aunt Minnie. . . . . I asked Aunt Minnie if she was sure she had a will and she said yes, Mayme, I have a will and Burnham will be paid the way Uncle Sam and I said he would be paid, with the three eighties across the road. . . . I said, Aunt Minnie, are you sure; I didn't know if I should tell her or not but I did tell her. I said, are you sure, and she said, Mayme, if you are in doubt, get Ruth to go see a lawyer and have him come down and we will fix it so you won't have to worry. . . .

"Q. Then, what did you do? A. We got Ruth and went and told Mr. Martin about it. We had the doctor and Mr. Martin, and the doctor and Mr. Martin came to the house; and after that, I don't know what happened because Mr. Martin didn't tell us."

At the conclusion of plaintiff's evidence a demurrer was interposed to it, raising the statute of limitations, the statute of frauds, the nonclaim statute, and the insufficiency of the evidence to support plainiff's cause of action for specific performance.

This demurrer was overruled, and defendants produced witnesses whose testimony tended to show that certain of the alleged services plaintiff claimed to have performed for Mr. and Mrs. Henry were performed by others. One witness had negotiated a lease of the Henry land for oil in 1937; a letter dated December 26, 1930, from Stitt's father to J. S. Henry was introduced which tended to show that C. A. Stitt, the tenant of Mr. and Mrs. Henry, made a written report to J. S. Henry touching the crops of kafir, sudan, and oats and rendering an account of the Henry's share, and quoting market prices for wheat and oats. Another witness testified that his lumber company supplied materials for the buildings on the Henry farm, but that plaintiff had nothing to do with that transaction. Another witness, a carpenter, testified that he did several jobs on the Henry Farm, his last work being in 1938, that he put a roof on part of the house and on a shed; that the elder Stitt employed him, and that he did not know the plaintiff. A mass of correspondence between J. S. Henry and various persons was also offered in evidence. This correspondence extended over a period of 18 years next prior to J. S. Henry's death and covered a wide range of business transactions relating to the Sumner county land, with which the claimant had nothing to do.

Respondents also offered testimony of Missouri witnesses that in 1941, plaintiff and wife 'were at Boonville and made statements which tended to show that they realized that if Mrs. Minnie Henry did not make a will, plaintiff would get nothing, and that they endeavored to persuade her to make a will. Of course, the trial court could withhold credence to that evidence. We have sketched the principal features of the evidence, particularly that part adduced for the plaintiff, to place it in proper setting before we examine certain other evidence tendered on behalf of respondents which the trial court declined to consider in arriving at its judgment in this case. That rejected evidence was to this effect.

W. H. Martin, an attorney of Boonville, Mo., was called as a witness for respondents. He testified that a lawyer named W. G. Pendleton, of Boonville, had been the legal adviser of Mr. and Mrs. Henry; that he had been Pendleton's law partner since 1926; that in later years Pendleton had not been active in his profession and that the witness had handled Mr. and Mrs. Henry's legal affairs in 1938 and afterwards. The witness identified some pages of an account book dealing with the cattle-feeding partnership of J. S. Henry and

C. A. Stitt, his tenant on the Sumner county land, and they were offered in evidence. He testified that on the same Monday morning, May 5, 1941, as testified by claimant's wife, there was a meeting in the law office of Pendleton and Martin, at which Pendleton, Ruth Chambers, claimant and his wife, and the witness were present.

At this point counsel for plaintiff interrupted the examination. The record proceeds, in part, thus:

"[Counsel for plaintiff]: I have an objection to this witness's evidence. I wonder if I might be permitted to ask him a question or two, then raise that objection.

"Court: You may.

"[Counsel for plaintiff]: Who do you represent in this lawsuit? A. I don't think I represent anybody in this lawsuit.

"[Counsel for plaintiff]: When did you cease representing anybody in this lawsuit? A. I don't think I ever represented anybody in this lawsuit.

"[Counsel for plaintiff]: You don't think you have served as attorney for anyone in this lawsuit? A. Being an attorney, you can't do anything but what was done as an attorney; but, I have not taken part in the preparation of any of the papers in this trial.

"[Counsel for plaintiff]: You have done nothing actively resisting the lawsuit? A. Yes, I have looked up some evidence.

.    .    .    .    .    .    .    .    .    .    .    .

"[Counsel for plaintiff]: . . . you did tell me you were one of the attorneys representing those people in resisting this claim, didn't you? A. Yes, and I don't deny it now. I told you an experience of my connection with them.

"[Counsel for plaintiff]: At this time, you are an attorney for these people, representing them in resisting the claim of J. B. Henry. A. I am an attorney; I was consulted; I have looked up evidence. So far as preparation of the case for trial or participation in the trial of the case, I have nothing to do with it.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Court: How far does the Supreme Court say you can be a participant and qualified to testify? Offhand, I would say this gentleman is not qualified to testify by reason of his relationship to these clients.

.    .    .    .    .    .    .    .    .    .    .    .    .    .

"Court: Objection sustained.

"[Counsel for defendants]: We offer to prove by this witness all that testimony as shown in exhibit '10,' commencing at page 55 thereof, down to and including 65 in the transcript. If the Court wishes I will read it into the record as a proffer.

"Court: We can get it into the record later. The proffer is accepted and received.

"[Counsel for plaintiff]: We object to the proffer.

"Court: Objection sustained.

"[Counsel for defendants]: Is there any question about the waiver of the privilege of this witness to testify? He was the attorney of the decedent. . . .

"[Counsel for defendants]: There is a little question about the record. As I understand it, you excluded Mr. Martin's testimony on the ground that he is attorney resisting this claim, and not because he was the attorney for the decedent.

"Court: That's right, not because of the privileged communication rule but because the Supreme Court says it is improper for an attorney to appear as a witness when acting as attorney for parties resisting a claim."

As shown by the transcript from the probate court, the witness Martin there testified:

"Q. . . . What was the conversation between J. B. Henry and you, if any? A. Well, there were several matters discussed. Mr. Henry, Mr. J. B. Henry, asked me if Mrs. Henry had a will, and I told him I didn't think she did, that I was positive she didn't, I had never drawn it; I had discussed it with her, but she had never drawn a will, and he asked me to go to Mrs. Henry's to draw a will for her. I told him at that time that I wouldn't, from my information I had, I didn't consider Mrs. Henry in a mental condition capable of drawing a will. They told me, Mr. Henry or Mrs. Henry, I can't remember which, . . . that they had been to see Dr. Cooter, who was waiting on Mrs. Henry, and Dr. Cooter had told them Mrs. Henry's condition was such that she could draw a will. I went to the telephone and called Dr. Cooter and talked to him, and he told me that he thought her condition had improved to such an extent if she wanted to draw a will, she could draw one. I then told Mr. and Mrs. Henry that Mrs. [Minnie] Henry had not called me, . . . that I would not go to the house and draw a will and talk to her without having some other person present, and they suggested having Dr. Cooter go; and I then called Dr. Cooter back and made arrangements for him to meet me at Mrs. J. S. Henry's home that afternoon. . . . We made an appointment somewhere around three . . . Mr. and Mrs. Henry were there and when Dr. Cooter and I got there, they suggested they walk up the street, and they did, and I went in and talked to Mrs. Henry.

"Q. What did she say about drawing a will? A. Dr. Cooter told Mrs. Henry, he said, 'Now, Mrs. Henry,' this is as near as I can recall the conversation; he said, 'Since you have been taken ill, you have asked me to get you well enough to make a will;' and he said, 'Now, in my opinion, you are well enough to make a will.' She was lying in her bed; she said, . . . 'I am not going to make a will;' . . . Dr. Cooter and I went out on the porch, and Mr. and Mrs. Henry came down the street, and we talked to them and told them that Mrs. Henry had said she would not make a will, and Mr. Henry said to me, 'If she don't make a will, I will never get anything.' . . . Now, before we had come out here, at the house, when they asked me to go out to draw Mrs. Henry's will, I asked them if there was any special reason why a will should be drawn, and Mr. Henry said that he thought that he was entitled to the estate, part of the estate, that he was the relative of Mr. Henry and half of this land had belonged to Mr. Henry out here, and he thought he ought to get that, and inquired from me if under the law in Missouri he would be entitled to any part of the estate, due to his relationship with Mr. Henry, and I told him no. I asked him at that time, we were discussing the value of

the land, he had the tax receipts there with him, and I asked Mr. Henry in the presence of his wife, in the presence of Mr. Pendleton and Miss Ruth Chambers, I says, 'Does Mrs. Henry owe you anything;' and he says, 'She does not.'

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Q. Just state the conversation. A. I again asked him if he had any indebtedness against Mrs. Henry and he replied he had not.

"Q. And also looking through that black book, do you find any notations of payment of that $500 check? (Black book was one of J. S. Henry's books of account.) A. No, sir.

"Q. You looked for that purpose? A. Yes, sir.

"Q. I am referring now to exhibit 1, dated October 9, 1936. A. There is no entry of any payment of that note—

"Q. That $500 check? A. No, sir.

"There was no will at the time of the execution of exhibit A, the deed about which I was asked. Mrs. Henry had, since her husband's death, consulted with me several times with reference to a will."

Touching the $500 indebtedness which claimant owed J. S. Henry, referred to in witness Martin's testimony just quoted, Ruth K. Chambers had already testified about the time of claimant and wife's visit to Boonville in May, 1941, Mrs. Minnie Henry sent for her and said:

"Ruth, I am so sick, I don't know what to do. Mayme and Burnham have talked to me all the time they were here about fixing my will, and I am not going to fix a will, but I got the notes out of my box in the desk and handed to him and told Burnham that would pay him for everything he had ever done for him, and what he done for me."

At the conclusion of the evidence, and after argument of counsel, the trial court informally announced its conclusions of law and fact—that the alleged contract of 1932 had been made, and that it should be enforced; that the services rendered "were such a service that cannot be measured in money damages or money compensation;" and that the value of the services is not out of line with the value of the property. Judgment for the plaintiff.

At this point the record reads:

"[Counsel for defendants]: I would like to have you find the value of the services.

"Court: I believe the value of the land was placed at forty-two dollars on acres; I think that figures something like ten thousand dollars.

"[Counsel for defendants]: I take it you are figuring it from 1908 to the present time.

"Court: 1906, yes.

"[Counsel for defendants]: What date do you find the contract was made?

"Court: The contract was made in 1932."

In due time a motion for a new trial on all the usual grounds was filed, argued and overruled. Later a motion was filed by respondents asking that the specific conclusions of the court, as quoted immediately above, be included in the journal entry of judgment. This motion was overruled.

Hence this appeal. Various errors are urged, but we will consider first the exclusion of the testimony of the witness Martin.

It would seem that there was no occasion for court or counsel to stumble over the general rule touching the matter of lawyers appearing as witnesses in litigation in which their clients are involved. On that general rule the bench and bar have been in. virtual agreement for a generation. The Kansas rule as laid down in the Canons of Professional Ethics, 144 Kan. vii, xi, reads:

"19. APPEARANCE OF LAWYER AS WITNESS FOR HIS CLIENT.

"When a lawyer is a witness for his client, except as to merely formal matters, such as the attestation or custody of an instrument and the like, he should leave the trial of the case to other counsel. Except when essential to the ends of justice a lawyer should avoid testifying in court in behalf of his client."

The same rule has been carried in the Canons of Professional Ethics of the American Bar Association for 35 years. (Reports of American Bar Association, vol. 62, 1105, 1112.) Nothing this court has said is at variance with the spirit and intent of the rule just quoted. In respect to mere formal matters, there is ordinarily no breach of professional ethics in a lawyer's giving testimony in an action in which he is serving as an attorney. If he is called on to testify on material matters he may do so, but from that point onward he should withdraw from the case. In some cases, an attorney is morally bound to make that self-denial, otherwise justice might miscarry completely. This court has been over this subject a number of times. (*State v. Ryan*, 137 Kan. 733, 22 P. 2d 418; *Earhart v. Tretbar*, 148 Kan. 42, 80 P. 2d 4; *Protheroe v. Davies*, 149 Kan. 720, 89 P. 2d 890; *State v. Bechtelheimer*, 151 Kan. 582, 100 P. 2d 657; *Yarmick v. Metropolitan Life Ins. Co.*, ante, p. 16, 20, 131 P. 2d 881.) Other recent cases on this subject are *In re Estate of Stephens*, 207 Minn. 597, 293 N. W. 90; *In re Holden*, 110 Vt. 276, 4 Atl. 2d 882.

In no respect was the witness Martin disqualified to testify. He was not an attorney in the case. Indeed, he could not be, as he was a Missouri lawyer and had not been given the courtesy of being recognized as a foreign attorney affiliated with local counsel in the

case, nor indeed had he asked for it. True, he had amassed evidence for use of attorneys who were conducting the case for respondents, but that was no disqualification of his capacity to testify. Nothing is more common than for railroad corporations, insurance companies, industrial companies and others to employ highly trained attorneys to gather evidence for use in litigation. Not infrequently these investigators have to appear and testify as witnesses, and there is no sound objection to their doing so, since other attorneys conduct the litigation. Indeed the national government, in recruiting the staff for its Federal Bureau of Investigation gives preference to men of legal training and experience, and in the prosecution of criminals for federal offenses the government's witnesses are frequently members of its bureau who are duly licensed attorneys at law, although they do not appear in the dual capacity of witness and lawyer in the litigation.

It should therefore be clear that the trial court's ruling which barred the Missouri attorney from testifying was erroneous.

How important was his proffered testimony? We think it was highly important. If true, it tended to demolish the plaintiff's case like a toppled house of cards. If true, it tended to show that the matter of an alleged oral contract of 1932 between the plaintiff and Mr. and Mrs. J. S. Henry was an afterthought. If true, and fairly considered in connection with the discrepancies and missing links in plaintiff's evidence touching his alleged services for Mr. and Mrs. Henry, it would call for some judicial hardihood to declare that plaintiff's case was established by that clear, convincing and satisfactory evidence which is required to justify specific performance of an oral contract against the estate of a dead woman who could not testify in her own behalf. It was essential to the ends of justice that this witness should have testified, even if he had been an attorney of record in the case, as rule 19 of the Canon of Ethics suggests. This court holds that the exclusion of the proffered testimony of the witness was prejudicially erroneous.

Turning briefly to other errors urged by appellants, they argue that it was error to permit the claimant to testify to a conversation he overheard between his wife and Mr. and Mrs. Henry. However, the fact that his own lips were sealed as to conversation he himself had with those now-dead people did not disqualify him from testifying as to what he heard them say to her. In *Nash v. Harrington*, 110 Kan. 636, 644, 205 Pac. 354, it was said:

"Sometimes the inhibition of the statute (Civ. Code, § 320) which disqualifies a litigant to testify in her own behalf touching her alleged oral contract with a deceased person for an interest in land is circumvented by testimony such as this: 'I, the plaintiff, heard my father say to neighbor Jones that he, my father, had made an agreement with me that if I would stay at home with him, etc., that I should have the farm.' This sort of evidence is competent and to the point, although, of course, it is greatly in need of supporting evidence, of additional facts, circumstances and inferences consistent therewith, before a court would be justified in finding that such a contract was made." (p. 644.)

It is earnestly contended that so far as the alleged oral contract of 1932 is concerned it could not give validity to so much of it as related to whatever obligation Mr. and Mrs. Henry might have owed for any services antedating that time—back to 1908 as alleged by claimant, back to 1906 as found by the trial court. The contention is made that any such past obligation would not support a claim against either of the Henrys because it was not in writing. (G. S. 1935, 60-312; *Stone v. Barr,* 111 Kan. 775, 778, 208 Pac. 624; *Hammond v. Estate of Hammond,* 150 Kan. 113, 116, 91 P. 2d 19.) However, claimant's action was not grounded on an oral contract for services he rendered for J. S. Henry and wife between 1908 and 1932. His action is based on the oral contract of 1932, and if that contract should be sufficiently proved, and the promised services rendered according to its terms, it is largely immaterial whether any legal significance is attached to the allegations in respect to past services, or the proof thereof be considered or not. Certainly if there had been no services prior to the making of the oral contract of 1932, the agreed services to be performed thereafter, when fully rendered until the deaths of the Henrys, would support an oral contract which might be specifically enforced. And it could not detract from the strength of the promisee's right to have such oral contract specifically enforced because the consideration also included some tacit recognition of prior services which in themselves could form no basis for justiciable relief because of the bar of section 23 of the civil code (G. S. 1935, 60-312). The story of claimant's services, if true, might well serve as an intelligible background to claimant's cause of action—by way of inducement. We see no material error on this point.

It is also contended that the claim sued on was barred because it was not timely presented against the estate of J. S. Henry. It was not due then. It was not to be paid in land or otherwise until

after the death of Mrs. Henry. (*Richard v. Kilborn*, 150 Kan. 579, 95 P. 2d 545.)

The question is also raised whether any claim for services against Mrs. Henry's estate should be limited to those rendered within three years of her death. We think not. The contract alleged was for services to be rendered from 1932 until the deaths of the Henrys. It could not be barred until their obligation to perform had matured —at the death of the survivor of them.

The question is raised whether respondents were entitled to a jury trial. We hold not. In the matter of appeals from the probate court, the pertinent statute (G. S. 1941 Supp. 59-2408) says that subject to some exceptions such appeals shall be tried without a jury although an advisory jury may be called. The present claim cannot be considered as one of the exceptions. We think it was discretionary whether a jury should be granted or not; and this view is supported by the essential nature of the claim—for specific performance which has always been a suit in equity, not triable by a jury as a matter of right. (58 C. J. 1213; Merwin's Equity and Equity Pleading, §§ 10, 16.)

It is next contended that the value of claimant's services could readily have been compensated in money, consequently specific performance should not have been granted. A majority of this court rejects this contention—holding that there never was any contract that claimant should be compensated in money; he was to be paid in land; and if the oral contract is to be enforced at all, it should be enforced as nearly as practicable in accordance with the obligation of the promisors. (*Hoppas v. Bremer*, 114 Kan. 609, 220 Pac. 251, syl. ¶ 3.)

Counsel for respondents contend that under the rule of *Dixon v. Fluker*, 155 Kan. 399, 125 P. 2d 364, specific performance should not be granted because there was no filial relationship shown between the promisors and the promisee. In *Dixon v. Fluker*, there are some excerpts from some opinions in cases of specific performance which attach considerable significance to the existence of a filial relationship between the promisor and promisee. But none of the cited cases make the existence or nonexistence of a filial relationship the crucial point in the lawsuit. And *Dixon v. Fluker* did not so decide.

Finally, it is urged that the trial court erred in overruling the motion to correct the journal entry of judgment to have it include the trial court's findings as set out above—to wit, the value of the

claimant's services in money, "something like ten thousand dollars;" that such computation was made for services beginning in 1906; and that the contract was made in 1932. The trial court should have granted that motion, but since it was otherwise accurately incorporated in the record, the error was a minor one which has done the respondents no harm.

One error urgently stressed is predicated on the insufficiency of the evidence to prove the making of the contract and to prove its performance as alleged. Since the trial court rejected highly probative evidence which it should have considered before deciding that question, and a new trial must be granted on that account, we deem it prudent for the present to express no opinion on the sufficiency of the evidence.

The judgment is reversed and the cause remanded for a new trial.

SMITH, J., dissents from the rule stated in paragraph 7 of the syllabus and the corresponding portion of the opinion.