No. 20,075.

MARGARET C. CATHCART, *Appellee*, V. JOHN Q. MYERS, as Administrator with the Will Annexed, etc., et al., *Appellants*.

SYLLABUS BY THE COURT.

SPECIFIC PERFORMANCE — *Agreement to Leave Property to Adopted Child.* In a suit against the legal representatives and devisees under the will of a deceased person to compel the specific performance of a contract made by the testator, the facts stated in the opinion are held sufficient to support the trial court's findings that the deceased made a contract with plaintiff's father when she was 14 years of age, agreeing to adopt her as his daughter and at his death to leave her all his property in consideration of the father's surrender to him of her care, custody, control, society and education, and the further finding that the contract had been fully performed by the plaintiff and her father.

Appeal from Jackson district court; OSCAR RAINES, judge. Opinion filed April 8, 1916. Affirmed.

*I. T. Price*, of Holton, *T. F. Garver, R. D. Garver*, both of Topeka, *W. S. McClintock, A. L. Quant*, and *Edwin A. Krauthoff*, all of Kansas City, Mo., for the appellants.

*F. T. Woodburn, E. D. Woodburn*, both of Holton, and *A. E. Crane*, of Atchison, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The action in the district court was brought by the plaintiff to enforce specific performance of an alleged oral agreement between her father, William Cooney, and Felix C. Duffy, deceased, by which it is claimed the latter agreed to leave her all the property of which he might die seized in consideration of her father's surrender to him of her custody and permitting him to adopt her. The district court found that such contract was made and adjudged that plaintiff should have all the estate of Felix C. Duffy, subject to the payment of debts. From that judgment defendants appeal.

Felix C. Duffy was a Catholic priest of the parish at Monmouth, Ill., from 1882 to 1887, and of a parish at Kewanee, Ill., from 1888 until 1897, when he removed to Danville, Ill., and was in charge of the parish there until 1910. Plaintiff's

aunt, Mrs. Mary Bailey, then Mary Cooney, was housekeeper for Father Duffy. Her brother, William Cooney, had removed from Illinois to Graham county, Kansas, where he took a claim and lived with his family. Mrs. Bailey visited her brother on several occasions, and in 1890 took the plaintiff, who was seven years old, with her to Kewanee, and the plaintiff lived with her in the parish house with Father Duffy. At that time Wm. Cooney was in poor financial condition and had seven children. Plaintiff remained in the parish house until her aunt's marriage, when she made her home with the Baileys in Kewanee. After plaintiff left the parish house, in 1892, Father Duffy frequently visited her at the Bailey home and she visited him at the parish house, and they became much attached to each other. He made her presents of various kinds, dresses and other apparel. She was taken sick with typhoid fever while at her aunt's home, and Father Duffy took her to his house and provided a trained nurse and medical attention, paying all the expenses of her sickness. He was a distant relative of the Cooney family, and when Margaret's mother died in 1894 in Graham county, Kansas, he brought the child to the funeral and preached the sermon. In the fall of 1896 Father Duffy visited William Cooney in Kansas and offered to adopt Margaret, and said that if Cooney would consent to the adoption he would maintain and educate her and give her all the property he possessed at his death. The proposal was not accepted by Cooney at this time. In January, 1897, Father Duffy again visited William Cooney and repeated his offer. William Cooney testified that this time Father Duffy entered into a parol contract with him by the terms of which Cooney agreed to surrender to him the right to the care, control and custody of plaintiff, the right to have and receive plaintiff's obedience, society and love in all respects as though she were his own child, and Cooney was to consent to an adoption of plaintiff by Father Duffy, in consideration of which the latter agreed to accept the plaintiff as his own child, care for her and raise and educate her, adopt her and make her his heir; and further agreed that she should receive whatever property he possessed at his death. In pursuance of this agreement Cooney surrendered control and care of plaintiff to Father Duffy, and on the following day, January 14, 1897, Father Duffy and William

Cooney went before the probate court of Jackson county at Holton, where the plaintiff was legally adopted by Father Duffy.

Immediately thereafter Father Duffy returned to Kewanee and informed Mrs. Bailey, his former housekeeper, of the terms of this agreement, and requested her to inform the plaintiff, which she did. The foregoing statement of facts is taken substantially from the findings of the trial court. In addition thereto, the court made findings that William Cooney fully performed his part of the agreement, and that plaintiff on her part at all times complied with the terms of the contract, yielding to him the full duty of a child to a father; that during the remainder of his life Father Duffy at all times enjoyed to the full the love and affection of the plaintiff and her society in all respects as desired by him, visiting with her at the home of the Baileys, and that she visited him at Chicago and other places and joined him in a trip to Europe. The court further finds that Father Duffy complied with the contract in part; that he adopted the child and educated her and looked after her welfare during her schooling and afterward; that when she contemplated marriage he was pleased with her choice and consented thereto; that after her marriage in 1909 to Sloan Cathcart he provided a house for her and her husband and paid the expenses of improving it.

After her marriage Father Duffy lived for a time in her home with her husband while she was absent taking treatment for an affection of the eyes. He made large financial investments in and near Mayetta, Kan., where plaintiff and her husband lived, and did so in the belief that it would be for her best interests. The court further finds that in all respects he continued to manifest a natural father's interest in and affection for her, and complied with all the terms and conditions of the agreement with William Cooney, except that he failed and neglected to give her the property he had at his death.

At the time of making the contract with William Cooney, Father Duffy owned 200 acres of land near Mayetta, subject to a mortgage of $3000. He was receiving by way of salary and perquisites of his calling about $1400 a year, with the free use of the parish house. The court finds, however, that in 1905 he was given a deed for a tract of land in Illinois which he af-

terward sold for $54,000, and that during seven years ending in 1909 he served as a trustee of the estate of Michael Kelly, at Danville, Ill., and for his services received the sum of $25,000; that at the date of his death Father Duffy owned real estate, situated for the most part in Jackson county, stock in a bank at Mayetta, an interest in several business enterprises in Mayetta, together with property in Illinois and Ireland; and that he was indebted to a large amount, the exact total of which had not been determined.

Additional findings of the court are:

"After the adoption Father Duffy paid Mrs. Bailey for keeping plaintiff and he furnished her clothing and other necessaries until she was sent away to school, and thereafter he bore all her expenses until her marriage. . . . .

"Prior to his last trip to Europe, Father Duffy signed and acknowledged a deed conveying to the plaintiff the property in Mayetta in which she lived, and left the deed in the First National Bank of Mayetta. After Father Duffy's death, the cashier of the bank handed the deed to Sloan Cathcart, husband of the plaintiff, but neither the plaintiff nor her husband had any knowledge of the existence of the deed until after the grantor's death. At the date of his death this property was of the value of about $2000.

"At his death he left no direct descendants, his only relatives being brothers and sisters, who except for his adoption of plaintiff would have been his heirs at law.

"From and after March 1, 1913, Felix C. Duffy was somewhat enfeebled in body and mind.

"In the spring of 1913 he went to Ireland, and while there he executed a will by which, after making provision for masses, he gave 400 pounds to each of his brothers and sisters and the residue to the Bishop of Ardagh Diocese, County of Longford, Ireland, to be by him used in the erection of a church. In this will no mention whatever was made of the plaintiff. Said will was admitted to probate in Ireland on the 6th day of October, 1913, and thereafter was admitted to probate in the probate court of Jackson County, Kansas, on an authenticated transcript of the record of the court in Ireland and the defendant, John Q. Myers, was duly appointed and qualified as the administrator with the will annexed of the estate of Felix C. Duffy, deceased.

"Prior to the adoption Father Duffy conceived the idea that William Cooney might take the plaintiff away from Kewanee and deprive him— Father Duffy—of her society, and in the autumn of 1896, he visited Mr. Cooney in Kansas and requested his consent to Margaret's adoption by him and proposed to the father that if he would consent to the adoption, he, Father Duffy, would maintain and educate her and give to her all the property he possessed at his death, which proposition was not acceded to by William Cooney at that time. . . .

Cathcart v. Myers.

"This contract is reasonable in its terms and was freely and fairly entered into between the parties and was fully performed by the plaintiff and her father."

As a conclusion of law the court held that plaintiff is entitled to a decree for specific performance of the contract, subject to the payment of the debts which may be proved against the estate of Father Duffy.

The trial court having found that an oral agreement as claimed by the plaintiff was entered into between Father Duffy and William Cooney, that the contract has been executed by performance in full on the part of plaintiff and her father, William Cooney, and that the contract was reasonable, there is little left for this court to decide; for we think there was evidence sufficient to sustain the findings of fact.

In the briefs of defendants' counsel we have been referred to a multitude of cases from other courts refusing to decree specific performance of contracts of this nature except where made in writing or established by the most clear and convincing testimony of disinterested witnesses. It is hardly necessary to review these decisions because the same questions frequently have been before our own court in a number of recent cases in which contracts of the same kind have been enforced upon testimony not differing materially in character. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743, 9 L. R. A., n. s., 229; *Bichel v. Oliver*, 77 Kan. 696, 95 Pac. 396.) In the latter case it was said in the opinion:

"An oral agreement that operates as a transfer of land must, of course, be made out by clear and satisfactory proof, but it is not essential that it be established by direct evidence. If the facts and circumstances brought out are such as to raise a convincing implication that the contract was made and to satisfy the court of its terms, and that there would be no inequity in its enforcement, it is enough. (*Anderson v. Anderson*, 75 Kan. 117, 88 Pac. 743; *Edson v. Parsons*, 155 N. Y. 555, 50 N. E. 265.)" (p. 700.)

To the same general effect are, *Phillips v. Bishop*, 92 Kan. 313, 140 Pac. 830, and *Smith v. Cameron*, 92 Kan. 652, 141 Pac. 596. In the last case cited it was said in the opinion:

"An oral agreement of this nature, established by satisfactory proof and kept in good faith, affords solid ground for the exercise of the powers of a court of equity by a decree for specific performance." (p. 660.)

None of the letters written by Father Duffy to the plaintiff which were offered in evidence contained any reference to the

alleged agreement. All of them are filled with expressions of a father's sincere love and affection. Many of them contained remittances of substantial sums of money as gifts to the plaintiff. In one letter written from his hotel in New York city on the eve of his departure on one of his numerous trips to Ireland, there is mention of a will. The letter reads:

"I sail tomorrow on Umbria Cunard line. I hope for pleasure and profitable trip. Do not tell any person. I dont forget you. Mr. Keegan, lawyer of Danville, has my papers now. Good night and God bless her.

Very afft & faithfully yours,

F. C. DUFFY.

"*Please know* there is a will addressed to Mr. Keegan here in Astor House safe until I or he calls for it.                F. C. D."

As was said in the case of *Winne v. Winne*, 166 N. Y. 263, 59 N. E. 832, 82 Am. St. Rep. 647, cited in *Anderson v. Anderson*, supra.

"The obvious purpose of Mrs. Winne in entering into this contract was to secure to herself not only the prospective services, but also the enjoyment of the society of the plaintiff as her own child, with the hope that she might thus gratify her motherly love, and rear to manhood one who would prove worthy of her bountiful care. In this she was not disappointed." (p. 272.)

To quote from the brief of counsel for plaintiff:

When a child comes into a man's life, it makes him a better man. After such an event, a man loves all children better. In fact, such love makes him more charitable toward his fellow man. A man's heart is kept tender by the memory of the pure innocence and love of childhood. . . . The feelings and instincts which cause lonely and childless people to yearn for the pure, innocent love of childhood come from the goodness of their hearts. . . . Father Duffy dearly loved the little girl and he wanted her as his own. He wanted to gratify his fatherly love and rear this girl to womanhood. He had the pleasure of doing so. He saw her grow to womanhood, a beautiful and accomplished woman, and he had the pleasure of knowing that he had helped her when she needed help. . . . The sweetness and perfume of such a life developing under his care enriched his own life and gave a sweet perfume to his soul. With his blessings she became a wife and he lived to see her a mother. He was always solicitous about her welfare. To him she was always 'my dear Margurite.' "

We recognize the frequency with which cases of a similar nature are finding their way into the courts, and the great temptation there often is to set up fraudulent claims against the estates of deceased persons. We recognize also the duty of

courts to look upon the evidence by which it is sought to establish contracts of this kind with great jealousy and to weigh it with utmost care in order to determine whether the witnesses are telling the truth. But this duty rests in the first instance and with the greater force upon the trial court.

In this case we think there was sufficient evidence, direct and circumstantial, to sustain the court's finding that the contract was made as alleged and fully executed by the plaintiff and her father.

For these reasons the judgment is affirmed.

DAWSON, J., not sitting.