### No. 30,592.

VIVIAN LAUPHEIMER, *Appellant*, v. L. J. BUCK and TRACY PRITCHARD, Executors, etc., et al., *Appellees*.

(11 P. 2d 721.)

632

Opinion
filed June 4, 1932.

*I. T. Richardson,* of Emporia, for the appellant; *L. J. Richardson,* of Manhattan, and *L. W. Richardson,* of Topeka, of counsel.

*W. L. Huggins* and *Humbert Riddle,* both of Emporia, for the appellees.

The opinion of the court was delivered by

HARVEY, J.: This is an action in the nature of specific performance to establish and enforce an alleged parol contract between plaintiff and William Laupheimer by which plaintiff was to have his Kansas property at his death. The trial court made findings of fact and rendered judgment for defendants. Plaintiff has appealed.

Briefly the material facts may be stated as follows: William Laupheimer, for many years a traveling salesman for a wholesale shoe firm, accumulated property which, at the time of his death, March 6, 1930, the trial court found to be of the value of $167,000. It consisted of business properties in Emporia, a third interest in a farm near Emporia, government bonds, stock in building and loan associations, and cash in bank, all held at Emporia, and a $15,000 residence property in St. Louis, Mo. This last property had been purchased as a home for his mother and his only sister, who lived with and cared for the mother for many years. At the time of his death he was a widower. He had no children. He had two stepchildren, one living at Parsons, Kan., and the other at St. Louis, Mo. His only immediate relatives were his brothers, Martin Laupheimer, husband of plaintiff, Alex Laupheimer, who lived at St. Louis, and a sister, Fannie Bamberger, and three nieces, being daughters of his sister, just mentioned. For several years prior to his death he had been afflicted with paralysis agitans, commonly called palsy, which grew worse gradually. About six years prior to his death he retired from active business life except to care for and manage his Emporia property, and, until the change later to be mentioned, made his home at the Mit-Way hotel. For perhaps forty years he had been intimately acquainted with L. J. Buck, a banker at Emporia, and kept his account at the bank with which Mr. Buck was connected. He had made it a practice for many years often and repeatedly to discuss with Mr. Buck his financial affairs and details thereof, although he was himself a shrewd business man and was spoken of as being "hard-headed" in ultimately forming his own judgments and carrying them out. In October,

1923, he executed his will, which he had prepared by one of the leading attorneys of Emporia, whom he had known many years. By this will he gave the St. Louis home to his sister, should she survive him; if not, to her daughters. He gave to each of his brothers one dollar and stated as his reason for doing so that each had sufficient property to supply his every need. He gave each of his step-children $1,000. The remainder of his property he placed in trust for the use and benefit of his nieces, the daughters of his sister. He named his banker friend, L. J. Buck, and his step-son, Tracy Pritchard, executors of his will. When the will was executed he placed it in his box at the bank, but wrote a letter to L. J. Buck advising him where the will would be found, authorizing him to open the box, take the will out and have it probated, and giving specific directions for his burial, one being that he be buried at St. Louis by the side of his mother.

Martin Laupheimer had lived at Wichita, where his wife obtained a divorce from him in November, 1923. Soon thereafter he married plaintiff, many years his junior. In 1927 they were living in Indiana and were in hard circumstances financially. They had pawned or pledged their diamonds and some other personal effects, and plaintiff was running a rooming house. Martin visited William at Emporia in June, 1927, and returned to Indiana. There was later correspondence between them, but the letters were not produced at the trial. On several occasions Martin wrote or wired William for money. These communications annoyed William. He repeatedly talked with Mr. Buck about them and wanted to know: "Do I *have* to send this money?" Mr. Buck inquired: "Do you owe him anything?" William vehemently asserted that he did not. Mr. Buck's reply was: "Then you don't *have* to send it to him." Although it is not clear just when it was done, William did send Martin money in the way of loans. In December, 1927, William sent Martin $50. Soon thereafter Martin's wife, plaintiff herein, disposed of her rooming house and both of them came to Emporia, arriving there about December 14, 1927. William was living at the hotel, being assisted and cared for as needed by the manager and the help. Shortly before that he had fallen, and was bruised but not seriously injured. Previously he had not known or met plaintiff. Plaintiff and her husband had come from Indiana to take care of William. It is not contended the contract relied upon in this action had been made at that time. It is clear from the evidence it had not been made. How-

ever, they had been promised by William that they would be paid, or would be well paid, for their services. At plaintiff's suggestion an apartment was rented and plaintiff and her husband and William Laupheimer moved into it. Thereafter, until the death of William Laupheimer, about twenty-seven months later, the parties lived together in an apartment, with one change of location. Plaintiff prepared the meals, kept house for her husband and William Laupheimer, and she and her husband waited on him and took care of him until his death. William Laupheimer paid the rent on the apartment and paid for groceries and laundry and all other household expenses during this time, aggregating $3,208.91. He also gave checks to plaintiff amounting to $511 and to her husband amounting to $569. On February 17, 1930, William Laupheimer canceled a note payable to him which had been executed by Martin Laupheimer, plaintiff's husband, in the sum of $1,735.98, which represented moneys loaned to Martin from time to time, including money loaned to redeem the diamonds pledged by plaintiff and her husband. On that date he also executed a check for $1,500 payable jointly to plaintiff and her husband, which he gave to them, and suggested that they deposit it to their joint account in the building and loan association. Both of them indorsed this check and deposited it as suggested. On March 3, 1930, Martin Laupheimer asked William for a check for $300 to pay rent and other household expenses. William thought a check for $150 would be sufficient, but on the advice of his physician and Mr. Buck, who were present at the time the request was made, and with some reluctance, he did make the check for $300. He was a man who "didn't like to let go of his money." William Laupheimer had made no change in his will since it was executed in 1923, nor had he discussed any change or modification of his will with the attorney who prepared it, or with Mr. Buck, or with anyone with whom he ordinarily consulted about his business affairs. When William Laupheimer died, March 6, 1930, Mr. Buck followed the letter of instructions to him with respect to his burial, also opened his box at the bank, took from it his will, which was duly probated, without any objections from plaintiff or her husband, although he was present and he and others present were asked if there were any objections to its probate. This action was brought the following October.

As to the specific contract relied upon in this action plaintiff's evidence was to this effect: After the parties had moved from the

hotel into the apartment William Laupheimer spoke to plaintiff, expressing appreciation of the way she prepared his meals and took care of him, and expressed the desire that he wanted her to continue to do that as long as he lived; told her that he was worth a lot of money, spoke in a general way of his real estate and personal property, and told her in substance that if she would continue to care for him as long as he lived that he would leave her all of his property. Plaintiff rather demurred to it at first, suggested that he might not be satisfied with the care he would receive from her; he assured her he would be, and she suggested that the people in St. Louis might object. As to that he said he would make his own contracts and run his own business. The matter was discussed in a general way on two or more occasions until December 28, 1927, when William Laupheimer pressed plaintiff for a definite understanding about the matter. She asked him to state his proposition, and he said, in effect: If you will stay here and take care of me as long as I live I will pay all the household expenses and at my death will leave you all of my Kansas property. Plaintiff agreed to that. Plaintiff's husband, sitting within hearing, testified to this conversation, and that then William Laupheimer spoke to plaintiff's husband and asked him if he heard that. Pretending he did not hear clearly, William repeated it to him. Plaintiff testified to the statements made by William to her husband. The woman in charge of the apartments was in and out frequently, and she testified that soon thereafter William Laupheimer told her of the contract he had recently made with plaintiff. There is testimony that one day early in 1928 L. J. Buck called to see William Laupheimer, told plaintiff and her husband that he had some business to transact with him and would like to talk with him alone. They retired to the room of the manager of the apartments, and in about an hour Mr. Buck advised them he was through with his business, and soon thereafter left the apartment; that soon after Mr. Buck left William Laupheimer told them that he now had the papers fixed to carry out the contract he had made with plaintiff. With respect to that transaction Mr. Buck testified that he did go there in February, 1928, to transact business, but that the business transacted was the making out of the income tax report for William Laupheimer, and he produced data and computations which he testified were gone over or made at that time in that connection, and further testified that was the only business transacted. Mr. Buck called to see William Laupheimer often,

sometimes being sent for. Other friends called, some of them frequently. Several witnesses on behalf of plaintiff testified of the good care given William Laupheimer by plaintiff and her husband; that he had expressed appreciation of the care and stated that they would lose nothing by it, or would be well paid for it; that he had it fixed so they would be well paid for it, or words to that effect.

From the evidence the court found, among other things:

"The evidence to establish the making and entering into, or the execution of the oral contract is insufficient and is far from satisfactory. I am not convinced by the evidence introduced that the contract set out in the petition was in fact-made."

Appellant complains of this finding of the trial court. We commend the court for having made it. Inherently the testimony to support the contract relied upon by plaintiff contains many elements of improbability. Shortly before plaintiff and her husband came to Emporia, obviously the business they were engaged in was not successful, for they had pledged their personal effects and plaintiff's husband was borrowing small sums from his brother. They came to Emporia to care for him, with the understanding that they would be paid for it—not with the understanding they were to have all his Kansas property. In addition to actual living expenses they were paid sums, including the canceled note of plaintiff's husband, aggregating $4,315.98. If they deemed this insufficient they could have presented a claim for further compensation to the probate court.

To establish the fact that this man—shrewd, capable and painstaking in business matters, who always consulted his banker and frequently his lawyer, and who "didn't like to let go of his money" even up to three days before his death—should, in addition to what he paid, give plaintiff his Kansas properties of the value of $152,000, without making any change in his will or consulting his business advisers, requires clear and convincing evidence. If plaintiff was to have all of his Kansas properties, why was he so particular, on February 17, about two weeks before his death, when he must have known the end was near, to give plaintiff and her husband $3,235.95 by check and canceling a note? If plaintiff's contention be true, that was a useless formality. If plaintiff owned all this property immediately on the death of William Laupheimer, why did she permit the will, which gave it to others, to be probated without protest, and the estate to be administered thereunder for seven months

before taking steps to protect her rights? These and other considerations naturally forced themselves upon the attention of the court. This case is of that class in which trial courts are called upon to examine with care the evidence offered to sustain the contract relied upon. This court, and others, have frequently so ruled. (*Cathcart v. Myers,* 97 Kan. 727, 732, 156 Pac. 751; *James v. Lane,* 103 Kan. 540, 549, 175 Pac. 387.) Where the evidence to establish the parol contract relied upon consists of the testimony of plaintiff and his near relatives and immediate friends there is all the more reason for careful scrutiny. Some courts have ruled that the testimony must come from disinterested witnesses. (*Andrews v. Aikens,* 44 Ida. 797, 260 Pac. 423.)

From what we have said we do not want to be understood as passing upon the weight of the evidence in this case. We are simply pointing out some items of evidence necessarily considered by the court in reaching its conclusion of fact and which justify and sustain it. There are other items of evidence in this case, the consideration of which would lead to the same conclusion, but we shall not take space to enumerate them.

Appellant complains that the court did not make requested findings that the conversations between plaintiff and her husband and William Laupheimer took place on December 28, 1927, as testified to by them. The fact that these specific findings were requested, and the court refused to make them, but in lieu thereof made the finding above quoted, is tantamount to a finding that no such conversations took place.

Appellant complains of some of the other findings of fact made by the trial court. We have examined these complaints and find no substantial merit in them. In fact, none of them becomes important if the contract relied upon is not established. The basis of plaintiff's claim is the contract, and if she cannot establish that she has no right to recover. "The contract is the foundation of plaintiff's right to recover." (*Dreher v. Brumgardt,* 113 Kan. 321, 214 Pac. 419.)

Parol contracts of the character relied upon in this action, when compliance with them requires the transfer of title to real estate, are normally unenforceable under the statute of frauds. They are enforced by a court of equity only when the evidence to establish that the contract was made is clear and convincing, that it has been

complied with by the promisee, and the services performed thereunder are fairly commensurate to the amount claimed; that the promisee has no other adequate remedy to recover compensation for the services performed, or that they are of such a character they cannot be measured in money, and that under all the circumstances it would be inequitable and against good conscience and fair dealing not to enforce them. In this case, when we consider the amount already paid, the value of the property claimed is out of all proportion to services rendered. Appellant does not argue the point, neither is there any attempt to show that plaintiff could not have recovered any additional compensation due her, if the amount already paid was insufficient, either by an action at law, or by presenting her claim to the probate court.

There was testimony on the question of whether the physical condition of William Laupheimer affected his mental ability. The court found that his mental ability was impaired to some extent, and in view of that, and of the situation of the parties at the time the alleged contract was made, the rule requiring independent advice was applicable. Appellant complains of that holding. We find it unnecessary to consider that carefully for the reason, unless plaintiff had the contract relied upon, she is not entitled to recover in any event.

Appellant complains of the manner in which the trial was conducted, and this presents the only question of consequence is this case. At the beginning of the trial the following colloquy between the court and counsel took place:

COURT: "Before we begin I am wondering shall we proceed in the way we did in the Duncan case in Chase county, reserving rulings and numbering them, or would it be better to rule on them as we go along? Personally I would rather reserve the ruling and preserve the numbers."

Attorney for defendants: "I am sure, as I stated before, that some close legal questions will be developed in this case. I would suggest that where your honor has any doubt about it you should reserve your rulings; where your mind is clear, rule as we go along."

Attorney for plaintiff: "That is agreeable to us."

When defendants began offering their evidence counsel for plaintiff made numerous objections. Some of these were ruled upon at the time, but the rulings of the court were reserved on 212 objections, which were carefully marked for identification and numbered. Fifty of these objections were later withdrawn. At the time the

testimony was being taken no objection was made to the court withholding its rulings. When the evidence was completed a transcript of the testimony was prepared. The trial court took the transcript and the exhibits, carefully went through each one of the reserved rulings, and as to each one made a statement of the question ruled upon, and included a statement of its rulings in the findings of fact. In 118 cases objections were sustained. In twenty instances they were overruled. In eighteen instances relating to correspondence objections were sustained as to contents of letters, but overruled as to the fact that correspondence was had between the parties. There were two duplications of numbers. Appellant contends that because of the reserved ruling on so many questions she was unable to know the views of the court as to the evidence, and therefore uncertain what rebuttal evidence, if any, to offer. If plaintiff found herself so handicapped it would have been well to have called it to the attention of the court while the trial was in progress. No showing is made that any other witnesses would have been called or any different testimony introduced on rebuttal had the rulings been made as the trial progressed. Plaintiff called witnesses in rebuttal and no complaint is now made that either in her case in chief, or in rebuttal, was any evidence offered on plaintiff's behalf excluded. In its findings the trial court specifically stated that in making the findings it did not consider any of the evidence objected to by plaintiff. In view of these facts we do not see how it is possible for plaintiff to have been prejudiced. by the trial court reserving a number of rulings in the manner above stated. We wish to make it clear, however, that we do not commend that practice. Certainly it might be confusing to counsel, even to the court. Occasionally a trial court may find it to the interest of justice and as tending to promote a fair trial to reserve a ruling as to certain objections, or to a certain class of evidence. A few of such reservations may be readily kept in mind by counsel and the court, but when the number becomes large the difficulty of doing so is greatly increased.

There is no material error in the record, and the judgment of the court below is affirmed.