No. 43,925

In the Matter of the Estate of Gertrude McCourt Shirk (Deceased). BETTY SHIRK, *Appellee,* v. WILLIAM S. SHIRK, Executor, et al., *Appellants.*

(399 P. 2d 850)

Opinion filed March 6, 1965.

*Emmet A. Blaes,* of Wichita, argued the cause, and *Roetzel Jochems, Robert G. Braden, J. Frances Hesse, James W. Sargent, Stanley E. Wisdom, Cecil E. Merkel, Harry L. Hobson, Bruce W. Zuercher, L. D. Klenda, Charles M. Cline, Richard A. Loyd* and *Stephen M. Blaes,* all of Wichita, and *Jack O. Bowker,* of McPherson, were with him on the briefs for the appellants.

*Evart Mills,* of McPherson, argued the cause, and *Michael T. Mills* of McPherson, was with him on the briefs for the appellee.

The opinion of the court was delivered by

HATCHER, C.: This is an appeal from a judgment which found the existence of an oral agreement to provide for a share in an estate, and decreeing specific performance of the agreement against the deceased promisor's estate.

This appeal is another chapter of the protracted litigation following the death of Gertrude McCourt Shirk of McPherson, Kansas. (See *Shirk v. Shirk,* 186 Kan. 32, 348 P. 2d 840; *In re Estate of Shirk,* 186 Kan. 311, 350 P. 2d 1; *In re Estate of Shirk,* 188 Kan. 513, 363 P. 2d 461; *Shirk v. Shirk,* 190 Kan. 14, 372 P. 2d 556.)

The general facts which are not in dispute will first be stated.

Gertrude McCourt Shirk had been a resident of McPherson, Kansas for many years. She was originally married to A. L. Rankin. The marriage ended in divorce. A daughter born to this marriage died in infancy.

Gertrude later married William Snyder Shirk. Two children were born to this marriage. William S. Shirk was born December 27, 1911, and Betty Shirk was born July 3, 1913. They are referred to as Bill and Betty in the record and will be best identified here by such reference.

Bill and his present wife, Claire, have three children all of whom are minors. They are William, George and Mary Gertrude.

Betty was married to Leland Quantius in 1934. Carmen was born to this marriage October 1, 1937. Betty never returned to McPherson except for short visits thereafter. Betty divorced Leland Quantius April 1, 1939.

Gertrude adopted Carmen in 1940. The final order of adoption was entered January 11, 1941. On August 15, 1941, Betty married Walter E. O'Brien. In the fall of 1942, they commenced proceedings for the adoption of Carmen from Gertrude with her consent. A final decree for this adoption was entered June 14, 1943. Danny O'Brien, who is now a minor, was born to this marriage.

Gertrude died on September 17, 1957, leaving a will dated December 10, 1956, which was admitted to probate October 17, 1957. Gertrude died having jointly owned securities of $13,000.00 with Bill and approximately $20,000.00 with each of her five grandchildren which the executor was directed to deliver to each of the surviving owners. There was subject to administration under the will personal property of the appraised value of $226,492.42 and real property of the appraised value of $225,000.00. This property was bequeathed to Bill in trust for the benefit of himself and the five grandchildren. The income was to be distributed one-half to Bill and one-half to the five grandchildren. When the youngest grandchild reached the age of 30 years the corpus of the estate was to be divided in the same proportion. Betty was to receive $100.00 per month from the income of the estate subject to conditions.

When the will was read Betty seemed pleased and stated, "I done a whole lot better than I expected."

On September 23, 1957, Betty filed a petition for the allowance of the $100.00 per month, stating that she was in "necessitous circumstances."

On April 19, 1958, Betty brought an action against Bill to recover the sum of $200,000.00 alleging that he wrongfully influenced Gertrude to make the above mentioned will and fraudulently induced her to release her right to contest the will. This action was not successful. On July 14, 1958, five days before the expiration of the time for filing claims against the estate, Betty filed a petition for allowance of demand. The demand was for the value of one-third of the estate because of an alleged oral contract made with Gertrude during her lifetime. We will present only so much of the amended petition for allowance of demand as pertains to the alleged facts and circumstances under which the oral agreement was made:

"During 1939 Gertrude McCourt Shirk was very disappointed in the conduct and marital failures of her two children, William S. Shirk and Betty Shirk, and was displeased in the manner in which Betty Shirk was rearing Carmen Quantius. Following her divorce, your petitioner had difficulty in supporting herself and Carmen Quantius. She was required to be away from her child from time to time while engaged in her work and Gertrude McCourt Shirk believed Carmen Quantius was receiving inadequate care. In the fall of 1939, Gertrude McCourt Shirk took Carmen Quantius from the home of your petitioner at Topeka, Kansas and brought her to the residence of Gertrude McCourt Shirk in the Town House, a hotel owned and operated by Gertrude McCourt Shirk at McPherson, Kansas. . . .

. . . . . . . . . . . . . .

"Gertrude McCourt Shirk then orally proposed to your petitioner that if Betty Shirk would give her consent to the adoption of Carmen Quantius by Gertrude McCourt Shirk, that Gertrude McCourt Shirk would take good care of and rear Carmen Quantius, make Carmen Quantius her heir along with William Shirk and Betty Shirk, and that the three would share equally in her estate. Gertrude McCourt Shirk was deeply concerned in the health and welfare of her only grandchild and was afraid that if this grandchild died she would probably have no descendants after the death of her two children. Gertrude McCourt Shirk further stated that if thereafter Betty Shirk should be happily married and have a good home for Carmen Quantius, and if she and her husband should then desire to adopt Carmen Quantius, Gertrude McCourt Shirk would then give her consent to such re-adoption. Your petitioner believed that such an arrangement would be for the best interests and welfare of Carmen Quantius and she then accepted said proposal and agreed to do as her mother requested. The provision in said agreement that your petitioner would not be denied her one-third share as a daughter in the Gertrude McCourt

Shirk estate was incidental to the main purpose of such agreement which was to provide for and secure the welfare of Carmen Quantius.

. . . . . . . . . . . . . . . .

"Soon after making such agreement, and after Betty Shirk had lived for a while in the Town House with Carmen Quantius and her mother, Gertrude McCourt Shirk told Betty Shirk that she didn't want her living in McPherson and that she wanted her to leave McPherson, Kansas and establish a home for herself elsewhere. Betty Shirk then asked Gertrude McCourt Shirk how such would affect her share in the estate of Gertrude McCourt Shirk and Gertrude McCourt Shirk then promised that if she would go immediately she would get her third share in her estate. Your petitioner then agreed to do as her mother requested."

The petition for allowance of demand was transferred to the district court for trial. The trial court rendered judgment in favor of the claimant, and the executor and the grandchildren, through their various representatives, have appealed.

The appellants claim numerous errors on the part of the trial court. However, we will first consider appellants' contention that: "The claimant completely failed to establish any contract with the decedent by the required standard of clear and convincing evidence."

Before considering the evidence by which appellee sought to establish her claim we will give attention to the law which is to guide us in our consideration and determination of the question.

In considering the sufficiency of evidence to establish an oral contract with a person since deceased to devise, bequeath, convey or not disinherit, a much different rule is applied than is applicable to proof in the ordinary civil action. It is not sufficient that the claimant establish the contract by a preponderance of the evidence which usually satisfies the burden of proof, but the contract must be established by clear and convincing evidence.

Also in reviewing the sufficiency of such evidence on appeal a much different rule is applied than is applicable to the review of evidence in the ordinary civil action. If the trial court finds that such an oral contract was made this court will not only review the record for the purpose of determining if there is any substantial evidence to support the finding but will consider the evidence for the purpose of determining whether it is clear and convincing.

Those who desire to apply this exception will avoid confusion if they understand that the exception does not apply on review where the district court has made a negative finding, i. e., that there was no such oral agreement. In *Potts v. McDonald,* 146 Kan. 366, 369, 69 P. 2d 685, it was stated:

". . . It is quite common on review to set aside an affirmative finding because the record shows there was insufficient evidence to support it, which is widely different from setting aside a negative finding to the effect that the evidence did not prove or establish the allegations of the petition. Whenever there was any evidence in support of the allegations, the trial court in holding it was insufficient, may have so held because of the limited quantity of it, or because of its questionable weight and the credibility of it. . . ." (*In re Estate of Winters,* 192 Kan. 518, 389 P. 2d 818.)

This court has frequently and consistently held that oral contracts of the sort under consideration here must be established by clear and satisfactory proof or by proof that is clear, satisfactory and convincing. (*Bond v. Bond,* 154 Kan. 358, 118 P. 2d 549; *Trackwell v. Walker,* 142 Kan. 367, 46 P. 2d 603.) Courts of equity will subject the evidence submitted as proof of such contracts to close scrutiny and the contract must be established by the clearest and most convincing proof, a mere preponderance of the evidence being insufficient. (*In re Estate of Towne,* 172 Kan. 245, 239 P. 2d 824.)

In the recent case of *In re Estate of Duncan,* 186 Kan. 427, 350 P. 2d 1112, it was stated at page 432:

"In considering the contention that equity should decree specific performance of the alleged oral contract in the instant case, we are guided by cautionary rules and equitable principles which have developed from innumerable cases of this character. It has been repeatedly held by this court that before one can recover under an alleged oral contract to will or devise property to another, such a contract must be clearly and definitely developed by direct evidence or corroborating testimony, or by circumstances from which the reasonable inference arises that an agreement was made. . . ."

The Kansas decisions appear to have followed the general rule. It is stated in 81 C. J. S., Specific Performance, § 142, p. 722, as follows:

"As a general rule, in order to entitle plaintiff to a decree for specific performance, the facts essential to a recovery must be established by that high degree of proof which has variously been characterized by the terms 'clear,' 'clear and convincing,' 'clear and satisfactory,' or other equivalent expressions. Although the right to relief must be established by a preponderance of the evidence, it has been held that proof by a mere preponderance of the evidence is insufficient, that the essential facts entitling plaintiff to relief must be shown by a clear or decided preponderance of the evidence, and that, if the proof is substantially evenly balanced relief will be denied. Specific performance will be denied in a doubtful case, or where the evidence is uncertain and conflicting, but this does not mean that specific performance must be denied simply because the evidence is conflicting. The right to specific performance must be established by substantial evidence, and all the relevant evidence should be considered in determining whether a contract should be specifically enforced."

Also, in 49 Am. Jur., Specific Performance, § 169, p. 191, it is stated as follows:

"Where a proceeding is brought for specific performance, the rule seems to be established that more than a mere preponderance of testimony is required to establish the existence of the contract when its existence is denied. In order that specific performance of a contract may be decreed, the evidence of the making of the contract must be clear and convincing, or, as stated, in some cases, clear, cogent, and convincing, or strong and conclusive. . . ."

The term "clear and convincing evidence" is too illusive to be the subject of an exact definition. Perhaps to a great extent the determination must be made from the facts and circumstances of each particular case. The cases which have stated the reasons for the rule should supply some guide for its application.

Claims such as the one we are presently considering have been characterized as "inherently dangerous" (*James v. Lane,* 103 Kan. 540, 175 Pac. 387), because they offer a great temptation to set up fraudulent claims against the estates of deceased persons. (*Woltz v. First Trust Co.,* 135 Kan. 253, 259, 9 P. 2d 665.)

In *Walter v. Warner,* 298 F. 2d 481, it was stated on page 482:

"It is basic in the law of Kansas that an oral contract providing that title to real estate shall pass from one party to another at the death of the former will be enforced by specific performance if the contract was not inequitable and was fully performed by the promisee, but in a case of that kind the evidence will be scrutinized carefully and relief will be granted with caution as such cases sometimes lend themselves to the assertion of fraudulent claims. . . ."

The reason was further extended in *Heine v. First Trust Co.,* 141 Kan. 370, 375, 41 P. 2d 767, as follows:

"In the case of *Purcell v. Miner,* 4 Wall. (U. S.) 513, 18 L. Ed. 435, an oral contract of this sort was considered. The court said:

" 'It cannot be made out by mere hearsay, or evidence of the declarations of a party to mere strangers to the transaction, in chance conversation, which the witness had no reason to recollect from interest in the subject matter, which may have been imperfectly heard or inaccurately remembered, perverted or altogether fabricated; testimony, therefore, impossible to be contradicted.' (p. 518.)"

The reason for and the application of the rule is stated in 69 A. L. R., page 167, as follows:

"It has been remarked that contracts of the character in question have become so frequent in recent years as to cause alarm, and the courts have grown conservative as to the nature of the evidence required to establish them, and as to enforcing them when established. Also, that causes of this character are inherently easy to prove and hard to combat,—a characteristic that should not impair the action when proved, but which should cause the court to proceed

with caution. And the view has been expressed that, when such a contract is made the basis of an action, the evidence in support of it should be looked upon with great jealousy, and weighed in the most scrupulous manner. The character, conduct, and testimony of the witnesses should be such as to inspire confidence that they are telling the truth. Such a contract can be enforced only when it is clearly proved by direct and positive testimony and its terms are definite and certain."

What is meant by the term "clear and convincing evidence" is well stated in an instruction approved in *Aetna Insurance Company v. Paddock,* 301 F. 2d 807, it was stated at page 811:

"Regarding sufficiency of proof, the court defined 'clear and convincing evidence' in the charge as follows:

" 'To set aside and reform or correct that instrument in which a mutual mistake is alleged, it must be shown by clear and convincing evidence, and by that term is meant the witnesses to a fact must be found to be credible and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order and that the testimony be clear, direct and weighty and convincing, so as to enable you to come to a clear conviction without hesitancy of the truth of the precise facts in issue.' This is a fair and well supported definition."

We must next consider the testimony submitted by appellee for the purpose of determining whether it meets the required test of clear and convincing in establishing the alleged contract.

Appellee submitted the testimony of five witnesses to establish her claimed contract. We accept the appellee's summary of the testimony of three of her witnesses as follows:

J. J. Heidebrecht testified in substance:

"He said he was McPherson County Probate Judge from 1925 to 1955. He said he remembered Mrs. Shirk adopting Carmen Quantius. Mrs. Shirk told him privately that Betty's home was wrecked by divorce and that as soon as Betty settled down at her own home she would give the baby back to her."

Claudia Mae Ballweg testified in substance:

"She said she was acquainted with Mrs. Shirk and worked for her. Mrs. Shirk told her in 1940 that Carmen would share alike with Bill and Betty and each would get a third. Mrs. Shirk told her to make a will so each of her children would get the same amount. She said that was the way she had hers fixed."

Harold F. Aurell testified in substance:

"He said he was a master electrician and that he started working for Mrs. Shirk in 1917 and did practically all of her electrical work until the time she died. In 1940 Mrs. Shirk told him that Betty had gone to Texas, that she didn't want her around the hotel, but that she hadn't disinherited her. She said Betty would receive a third and Carmen a third and Bill a third of her estate. She emphatically did not want Betty around the hotel and said Betty would get a third share of her estate if she left McPherson."

A casual examination of the above testimony discloses that it falls far short of establishing any definite agreement between Betty and Gertrude, her mother. It is perhaps only submitted as corroborating what was thought to be positive testimony of the other two witnesses. Of the two other witnesses testifying, one purported to be a friend of the family and will hereinafter be identified as the Family Friend, and the other was a maid in the Town House Hotel which was owned by Gertrude and in which she lived. She will be identified herein as the Hotel Maid.

The Family Friend's testimony is summarized.

She said that she was a very close friend of Mrs. Gertrude Shirk and Gertrude consulted with her on many problems. In 1939, shortly after Betty divorced Leland Quantius, Gertrude called her to her apartment at the Town House Hotel. Gertrude said that she had received a telephone call from the baby sitter at Topeka informing Gertrude that Betty was in Kansas City looking for a job and that Betty had left Carmen in Topeka without any money with which to buy milk. Gertrude and she talked the matter over in detail. The Family Friend advised Gertrude to get the baby herself and to take care of it. Gertrude called in Bill and told him to go to Topeka to get the baby. The Family Friend returned that same evening, possibly seven o'clock, and saw the baby and again talked with Gertrude. The Family Friend stopped in at least a dozen times in the month immediately after the baby was brought from Topeka and visited on each occasion with Gertrude. Betty herself came in from Kansas City within about a week after the baby was brought from Topeka. The Family Friend visited with Betty two or three times; she regarded Betty almost like her own daughter. After Betty had been there a few days Gertrude called the Family Friend down to the apartment and there was a conversation with Betty and the Hotel Maid present. Betty apparently was not going to take care of Carmen and Gertrude said that she, Gertrude, was going to have to adopt Carmen in order to see that she was taken care of. Betty was worried about what this would do to Betty but Gertrude told her not to worry because Carmen would be treated as a child and there would then be Bill and Carmen and Betty, the three of them, to have her estate, one-third to each. Gertrude also told Betty to leave town and that if she remarried and had a good home for Carmen, Betty could re-adopt her. Within less than a week after that Betty left but the Family Friend did not know where she was going.

The Hotel Maid's testimony is summarized.

The Hotel Maid said that she worked for Gertrude about fifteen years. She remembered when Carmen was brought from Topeka but could not give the date. Carmen's baby sitter had called Gertrude and told her that Betty had gone to Kansas City and left her without any money to buy milk for Carmen. Gertrude then sent Bill to Topeka to bring Carmen back to McPherson. Gertrude put Carmen and her baby sitter in a room just across the hall from Gertrude's apartment, Room 71. About four or five days later Betty showed up and stayed in Room 65 for probably a week or a little longer. Gertrude had several times mentioned the idea of adopting Carmen. Then there was the conversation in her apartment when Betty was there. It was probably two or three days after Betty showed up. Gertrude did not think Betty could take care of Carmen and she figured that she would have to take care of Carmen herself. That is what she said and she thought that she had better just adopt Carmen and then Betty would not have anything to say about it. She said to Betty that she would make Carmen an heir along with Betty and Bill. She told Betty that she wanted Betty to leave McPherson. Betty asked if it would interfere with her share in the estate and Gertrude said that it would not make any difference. She told Betty that if Betty remarried and Betty and her husband both wanted to readopt Carmen and had a good home to take her to, she would let them. Betty stayed around about three or four days and then she left. Gertrude said that Betty had gone to Texas.

It must be noted that the testimony of the two witnesses as to the facts and circumstances surrounding the making of the alleged contract was given positively and in detail. This included the time when and place where the contract was made. The testimony was in accord with the facts alleged in the amended petition for allowance of demand. It would hardly be contended that the above testimony was not most clear and convincing. The difficulty is that all of the testimony as to the facts and circumstances surrounding the making of the alleged agreement was, by documentary evidence, proven to be absolutely false and untrue.

The appellants' evidence disclosed that Gertrude Shirk was in the Orient at the time Carmen was taken from Topeka to McPherson. Carmen was not picked up at the suggestion of Gertrude. On May 4, 1939, Bill received a telegram from Betty who was then in

Texas which read: "Get Carmen Topeka take charge of her until I can."

Bill picked up Carmen at Topeka and cared for her in McPherson until Gertrude returned from the Orient the latter part of June. Betty did not go to McPherson during the year 1939, except for a short visit at Christmas time. There is no evidence which indicates that Betty ever again returned to McPherson except for short visits or that she ever desired to return there to live.

At the close of appellants' evidence the claimant sought and obtained permission to reopen her case for the purpose of explaining the discrepancy in testimony of the two witnesses. The explanations were anything but satisfactory.

The Family Friend testified:

"Q. Yes. You testified with complete positiveness that you were the one that told Mrs. Shirk that she should send Bill up to Topeka to get Carmen.

"A. She asked me what I woud do, and I just suggested what I would have done, but I was—that was when she was gone, so she was not there."

She testified further:

"Q. All right. Now, if you didn't know then why did you come in here into court and testify to those things, Mrs. . . .? Just explain that to the Judge, will you please? If you didn't know then why did you tell him that under oath here last Monday? Can you? Can you explain why?

"A. Gertrude Shirk talked to me about her family all the time.

"Q. That isn't my question.

"A. So I don't know.

"Q. All right. Did it seem positive to you that with three days to a week afterwards Betty came, whether she came from Kansas City or where? Is that what seemed positive to you on Monday?

"A. Well, yes, it did.

"I was confused when I testified earlier and I am confused now. I didn't say anything about being confused Monday because I thought I knew what I was talking about."

The Hotel Maid testified:

"Q. Well, now you are telling us today that the things you testified to Monday are things that somebody told you. Is that right?

"A. No, but when he told about Mrs. Shirk being gone, I hadn't realized that she wasn't here, but it just seemed to me like she was here.

"Mrs. Shirk was a very definite, positive character. She was the owner of the hotel and she was my superior but she didn't treat anyone that way.

"Q. And there would be no confusing what Mrs. Shirk said as compared to what some other employee said, was there, Mrs. . . .?

"A. Well, no, probably not.

"When I testified Monday I was thinking that Mrs. Shirk had told me. Somebody had told me because I remember that and I remember him going.

"Q. Is that as much as you had Monday when you were testifying; namely, an impression of what happened? Is that as much as you testified—

"A. Well, I was thinking it was; yes. I thought that she had told me because I knew that if she had of been there she would have told me.

"Someone had to tell me he had gone and Monday when I testified I was thinking Mrs. Shirk had told me. I was confused as to the time it happened and I was also confused on the time when Betty came to McPherson after Carmen was here.

"Q. That isn't what I asked you. Not the time of the year. I am asking whether you were confused about the fact that it was three days or a week or something like that before Betty came in. Are you confused about that?

"A. I can't remember.

"Q. But you said Monday that you were positive about it.

"A. Well—

"Q. Now, were you confused then or are you confused now?

"A. Both, probably."

We must conclude that because of the inaccuracy and confusion shown to exist in the testimony of the two witnesses who attempted to establish the existence of the oral agreement the proof falls far short of being clear, satisfactory and convincing.

It might also be suggested that the conduct of the appellee casts some reflection on the validity of the claim.

When Gertrude's will was read Betty expressed surprise that she fared as well as she did. She made no claim that she had an agreement for more. In her correspondence with the executor and his attorney after the will was read Betty made various appeals for extra largess but never for the discharge of a contractual right.

When Betty first decided on litigation it was not for the enforcement of a contractual right but to recover $200,000.00 from Bill for unduly influencing Gertrude in the making of her last will and testament.

The appellee permitted the estate to be probated under the will for a period of nine months without protest. She filed her claim five days before the nine months period for filing claims had expired. There is a rather serious controversy as to whether the claim was in fact filed in time. Such unexplained delay casts serious doubts upon the integrity of the claim.

In 69 A. L. R., page 217, it is stated:

". . . It properly may be assumed that anyone having a claim of this kind under an oral contract with a person who has since deceased will be reasonably prompt in thereafter asserting it, especially where the circumstances are such as naturally to induce the assertion of the claim if the contract had actually been entered into. And his failure in this respect in and of itself, if unexplained, is sufficient to cast grave doubts upon the integrity of the claim

when subsequently asserted, as well as upon the evidence offered to establish it. . . ."

This court has had occasion to consider the effect of delay in making a claim where the property claimed is being probated under a will. In *Laupheimer v. Buck,* 135 Kan. 631, 11 P. 2d 721, it was stated on page 636 as follows:

". . . If plaintiff owned all this property immediately on the death of William Laupheimer, why did she permit the will, which gave it to others, to be probated without protest, and the estate to be administered thereunder for seven months before taking steps to protect her rights? These and other considerations naturally forced themselves upon the attention of the court. This case is of that class in which trial courts are called upon to examine with care and the evidence offered to sustain the contract relied upon. This court, and others, have frequently so ruled. (*Cathcart v. Myers,* 97 Kan. 727, 732, 156 Pac. 751; *James v. Lane,* 103 Kan. 540, 549, 175 Pac. 387.) Where the evidence to establish the parol contract relied upon consists of the testimony of plaintiff and his near relatives and immediate friends there is all the more reason for careful scrutiny. Some courts have ruled that the testimony must come from disinterested witnesses. (*Andrews v. Aikens,* 44 Ida. 797, 260 Pac. 243.)"

The appellee's evidence is insufficient to meet the burden which the law places on her to establish the oral contract under which she claims.

The conclusion reached renders unnecessary the consideration of other questions raised by appellants.

The judgment is reversed with instructions to render judgment for the Executor of the Estate of Gertrude McCourt Shirk, deceased, and for the intervening devisees under the will.

APPROVED BY THE COURT.

SCHROEDER, J., dissenting: I cannot agree with the court's decision to reverse the judgment. In my opinion, the court has simply reweighed the evidence and has undertaken the responsibility to determine the credibility of the witnesses. This was evidence which the trial court was in a better position to determine than the Supreme Court.

This is perhaps the final chapter in long and protracted litigation which followed the death of Gertrude McCourt Shirk. In my opinion the case should be fully written—not merely written to show the highlights of the appellants' case—but I hardly think a dissenting opinion the proper place to write it.

It is conceded by the parties the burden of proof in a case of this type requires the claimant to establish her contract by clear and

convincing evidence. The numerous *Kansas cases* cited in the opinion for the court establish this rule. But as applied, I am inclined to believe the court has pushed the rule to one requiring proof beyond a reasonable doubt if, in fact, the court has not simply reweighed the evidence.

For example, the court quotes approvingly from *Purcell v. Miner,* 71 U. S. 513, 18 L. Ed. 435, where an oral contract of this sort was considered. (Cited and quoted in *Heine v. First Trust Co.,* 141 Kan. 370, 375, 41 P. 2d 767.) *Purcell* was quoted to the effect that an oral contract cannot be made out by evidence of the declarations of a party *to mere strangers* to the transaction. But later in the opinion the court quotes approvingly from *Laupheimer v. Buck,* 135 Kan. 631, 11 P. 2d 721, which says:

"'. . . Where the evidence to establish the parol contract relied upon consists of the testimony of plaintiff and his near relatives and immediate friends there is all the more reason for careful scrutiny. . . .'" (p. 637.)

With such inconsistencies approvingly stated in the opinion, a claimant cannot successfully rely upon any witnesses to prove an oral contract by clear and convincing evidence. If all witnesses are subject to close scrutiny merely because they are strangers, or near relatives and immediate friends, it is readily apparent proof of an oral contract which would in effect deplete the assets of a decedent's estate is almost impossible without written evidence to establish its existence.

The court also quotes approvingly from 49 Am. Jur., Specific Performance, § 169, p. 191, as follows:

" 'Where a proceeding is brought for specific performance, the rule seems to be established that more than a mere preponderance of testimony is required to establish the existence of the contract when its existence is denied. In order that specific performance of a contract may be decreed, the evidence of the making of the contract must be clear and convincing, *or, as stated, in some cases, clear, cogent, and convincing, or strong and conclusive.* . . .'" (Emphasis added.)

By redefining clear and convincing evidence as something more than a preponderance of the evidence—pushing the definition beyond anything heretofore stated in the Kansas cases—the opinion for the court has injected confusion into the Kansas law.

This is indicated by the appellants' repeated assertion in their brief of the definition of clear and convincing evidence stated in *Aetna Insurance Company v. Paddock,* 301 F. 2d 807 (5th C. C. A. 1962), quoted by the court in its opinion, and adopted as Syllabus ¶ 2 in the case.

This point can be intelligently analyzed by considering Kansas cases where the trial court found in favor of the claimant, as to the establishment of an oral contract with a person since deceased, in an action seeking specific performance where the Supreme Court reversed on the ground the evidence was insufficient. Such cases are: *James v. Lane*, 103 Kan. 540, 175 Pac. 387; *Nash v. Harrington*, 110 Kan. 636, 205 Pac. 354; *Woltz v. First Trust Co.*, 135 Kan. 253, 9 P. 2d 665; and *Heine v. First Trust Co.*, 141 Kan. 370, 41 P. 2d 767. In none of these cases is there a definition of clear and convincing evidence as far-reaching as that adopted by the court in Syllabus ¶ 2. Some of these cases seem to require that the *terms of the contract* be established by clear and convincing evidence as distinguished from promises made by the decedent to do something in the future, or an expressed intention of the decedent to do something, thus rendering the existence of a contract uncertain or its terms lacking in certainty. Others say that claims of this nature should not be sustained upon doubtful proof.

Never has a mere conflict in the evidence been the basis of a reversal of the trial court. Furthermore, juries have been instructed as triers of the fact, for more than a century under Kansas law, in judging the credibility of a witness, that they may believe a part and reject a part of the testimony of a witness as being unworthy of belief. In the absence of a jury the trial court is entitled to use the same standard in determining the credibility of a witness. Now the Supreme Court says for the first time, if a witness is shown to have made a mistake, or testified falsely as to the time a contract was made, even though the terms of the contract are clear and certain, as established by other testimony of the witness, the entire testimony of such witness is unworthy of belief and must be rejected—that the contract has not been established by clear and convincing evidence.

The court in its opinion concedes the contract which the claimant sought to establish was shown by clear and convincing evidence insofar as the direct testimony of the claimant's witnesses is concerned. But it then proceeds to relate how confused these witnesses were as to when the particular contract was made, and, based upon this confusion, concludes the claimant's witnesses were unworthy of belief, contrary to the trial court's determination that the testimony of such witnesses was credible and worthy of belief insofar as the making of the contract in question is concerned.

The appellants in seeking a reversal of this case on appeal contend

that even without reviewing the testimony of the witnesses as obvious perjury, the evidence in the case is overwhelmingly indicative that no contract was ever entered into. The appellants then cite the following circumstances which are said to be particularly indicative:

"The alleged contract is completely inconsistent with the personality of Mrs. Shirk as described by all of the witnesses.

"In none of the correspondence during Mrs. Shirk's lifetime was the alleged contract ever mentioned.

"On the occasion when Mrs. Shirk disinherited Betty, the appeal to be reinstated did not even mention any contractual right to reinstatement. On the contrary, Betty resorted to the desperation tactic of having a grandchild, Carmen, tug at a grandmother's heartstrings.

"On the occasion of the reading of the will, Betty was surprised to have fared as well as she did, and she sought to have the benefits of the will extended to her immediately.

"In her correspondence with Bill and Mr. Cassler thereafter, she made various appeals for extra largesse, but never for the discharge of a contractual right.

"When she finally decided on litigation, it was not on what would be an obvious basis: the enforcement of a contract right. Instead, it was on a highly dubious and unsupportable tort theory: a $200,000 damage suit against Bill for obtaining his mother's last will and testament through undue influence. Though nine months were available to her to unveil the alleged contract, its germination and birth were apparently even too late to get under the wire before the bar of the non-claim statute operated!

"Finally, and completely inconsistently with the existence of any such contract, she tried to bribe her own daughter with a promise of one-half of what she would get out of establishment of the alleged contract."

To the court these circumstances appeared material, but it is necessary to consider in some detail the personality and character of Gertrude McCourt Shirk and her children as reflected by the record.

It must be borne in mind that Gertrude owned and operated a hotel for many years in McPherson, a relatively small town. She operated it with considerable success financially. This is indicated by the fortune which she amassed during her life. Gertrude and her children lived in this hotel atmosphere, thus subjecting the children to all the disadvantage and vice prevailing in such an atmosphere.

It was consistent with Mrs. Shirk's personality to make an agreement and later change her mind. She was an imperious dictatorial person who issued edicts. When she changed her mind she changed her edict. What she wanted at the time had to be fulfilled, notwithstanding any contract, promise, agreement or law to the contrary. Her imperious character is shown by the fact that she twice ob-

tained divorce decrees through emergency methods and had the decrees entered in one case the same day the case was filed, and in the other three days after the case was filed. That she was concerned with no ordinary compunctions is shown by her letter to Betty in December, 1939. She wrote:

"It may be just as well for you to come home for just a short while. You never pay any attention to any thing I say but I still hope that some day you will and I am very worried about you as I don't want you to make another mistake. You married once for love and where did it get you. You act like you are going to do the same thing again. There is no excuse for your doing this again. The only thing that matters social security and money to pay the bills and certainly should marry (if at all) a man much older than your self who has plenty of money."

In a will executed by Gertrude in 1945 she recited that she had made no contracts concerning her estate. Whether this was just the usual form of will used by the attorney at that time, or whether Mrs. Shirk was then conscious of having made an agreement with Betty and used this as an expedient way to evade her obligations, is not known.

In none of the correspondence presented to the trial court by the executor was there any evidence of an agreement not to disinherit Betty. At this point it should be stated the records and files of Gertrude McCourt Shirk were in the hands of Bill. Gertrude had been in the habit of retaining everything that occurred during her life in a system of files. Attempts by the attorney for Betty to examine these records and files of Gertrude was refused in spite of a demand for inspection and copy.

The appellee says in her brief that she believed written records substantiating Gertrude's agreement with her existed. One might ask why Bill thought there was reason for the refusal of such examinations. Extreme hostility and animosity was displayed by Bill and his wife toward Betty, and the trial court apparently felt there was doubt about their candor and truthfulness with regard to their production of all pertinent estate records. The record discloses Bill has at all times been very secretive. He failed to inventory the personal items of Gertrude's estate, and it was necessary for Betty to obtain a court order to compel him to do so. Bill was appointed executor without bond on October 17, 1957, and in his inventory and appraisement declared he had on hand $226,496.42 in personal property, other than jointly owned property, and that all of such property was in cash or securities other than $12,040 of such amount. When

Bill failed to file an accounting Betty petitioned the probate court on April 5, 1960, for an order requiring him to do so. The probate court ordered Bill to file such accounting, but as of the date of trial, he had failed and refused to file any accounting whatever in the probate court.

Betty received a telegram from her mother saying that she was disinherited when Carmen, then in the seventh grade, was living with Betty. Betty then dealt with her mother in the only way she knew possible—by begging. This she did by having Carmen write a letter to her grandmother which Betty dictated.

The trial court was entitled to believe that Betty knew her mother's mind had been poisoned against her, when Betty expressed surprise to learn that she had received as much as she did in her mother's last will and testament. The trial court was further justified in believing that Betty's correspondence with Bill and his attorney, Mr. Cassler at that time, following her mother's death was of the same tenor as that with her mother—begging, not demanding. The trial court was also justified in believing that Betty's action in filing a petition for probate of the will, after Bill had done so, and before Betty retained independent counsel of her own, was a fraudulent scheme of Bill to defeat Betty in her claim. That Bill was expecting Betty to file a claim within the period of the nonclaim statute is indicated by the various calls of Bill at the probate court in McPherson to see if Betty had filed a claim within the statutory period.

The charge that the nonclaim statute ran before Betty filed her claim in the probate court in the instant matter is not borne out by the record, and the court has so indicated in its opinion. That Betty's claim was not an afterthought is indicated by the testimony of the family friend that she made an affidavit in the office of Betty's attorney three months before the nonclaim statute had run.

Carmen testified that in October, 1959, Betty tried to get her to testify on Betty's behalf by offering Carmen one-half of what Betty got. This was long after the claim was filed and Carmen could be of little help. She could not remember and testify concerning conversations that took place in her presence at the age of two years.

Danny O'Brien went with his mother, Betty, when she saw Carmen some two or three times. He testified:

"Carmen said that she was upset because she was left out of the case since she was supposed to get one-third as was her mother and that she was mad at

Mr. Mills. I don't know what mother had to say about that. I did not hear my mother make any offer to Carmen to split with her."

In 1939 when the contract is alleged to have been made, Gertrude was over fifty years old and deeply interested in her only grandchild, Carmen. Bill was then unmarried and had already been twice divorced. Betty's then only marriage had ended in divorce. On March 22, 1939, Gertrude wrote to Bill concerning Betty as follows:

"If she wants a divorce why don't she get it. She is married to a rotter, I believe, and as soon as she gets rid of him the better for all of us."

Upon the entire record of the evidence presented in this case the trial court was entitled to find the terms of the agreements between Gertrude and Betty were clear and convincing and that the burden of proof had been sustained. It was apparent from the vigorous cross examination to which the witnesses were subjected that the witnesses who established the agreements were mistaken as to the exact date and some of the circumstances existing when such agreements were made. These events occurred more than twenty years ago, and, as a matter of common knowledge, memory as to inconsequential matters is dimmed by time, but the making of unusual family agreements—to adopt a child from the mother, to require the mother of the child to leave the state, and not to disinherit in exchange therefor upon specific terms of one-third, sharing with the grandchild adopted one-third—is impressionable on the human mind.

The existence of the contract is corroborated by the fact that Gertrude did adopt Carmen and Betty did leave the state of Kansas pursuant to the terms of the contract, facts concerning which there was no controversy in the record, and later after Betty remarried and established a comfortable home Gertrude released Carmen to Betty. This was also one of their agreements. Thus, the contract on Betty's part was fully performed and, considering all of the facts in the record, it was not inequitable. (See, *Woltz v. First Trust Co.*, supra.)

The trial court specifically found in its finding of fact No. 11:

"Betty Shirk O'Brien established her claim to a one-third share of the estate of Gertrude McCourt Shirk, deceased, by clear and convincing evidence. . . ."

In cases of this type it is *the function of the trial court to weigh the evidence* in accordance with the standard of proof required by

the law. This is established by *Jones v. Davis,* 165 Kan. 626, 197 P. 2d 932, Syl. ¶ 2, which reads:

"Although the evidence to establish such a contract must be clear and satisfactory, it is the trial court which is to be satisfied and convinced."

Also, in *In re Estate of Boller,* 173 Kan. 30, 244 P. 2d 678, this court said:

". . . There was evidence supporting the finding, which the trial court found was clear and satisfactory. The burden of so finding was on the trial court, not on this court. . . ." (p. 39.)

Also, in *Texas Co. v. Sloan,* 175 Kan. 735, 267 P. 2d 919, this court said:

". . . As has been often held the question whether the evidence is clear, strong and convincing is for the trial court, not this court. . . ." (p. 740.)

And in *Pattimore v. Davis,* 180 Kan. 534, 305 P. 2d 835, the enforcement of an oral contract was decreed which required clear and satisfactory evidence, and the court said:

". . . The trial court simply saw fit to find the contract enforceable, as already set out in this opinion. We cannot weigh evidence here. . . ." (p. 539.)

It is respectfully submitted the trial court should be affirmed for the reasons stated.